**UNITED STATES of America, Plaintiff,**

v.

**35.00 ACRES OF LAND, MORE OR LESS, Situate IN HICKORY COUNTY, STATE OF MISSOURI, and Arlo C. Crance et al., Defendants.**

**Civ. A. No. 764.**

United States District Court
W. D. Missouri,
Central Division.
Nov. 13, 1962.

10. The Law of Admiralty, Section 10–16.

11. Id., Section 10–18.

F. Russell Millin, U. S. Atty., by David M. Proctor, Jr., Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., by Edgar Shook, Kansas City, Mo., Ralph B. Nevins, Hermitage, Mo., for defendants.

BECKER, District Judge.

On August 4, 1961, the United States filed in this Court its complaint in condemnation and Declaration of Taking of fee title to 35 acres of land belonging to the defendant landowners. The Declaration of Taking was signed under date of July 24, 1961, by the Secretary of the Army pursuant to statutes authorizing acquisition of lands for use in connection with the construction and establishment of the Pomme de Terre Dam and Reservoir on the Pomme de Terre River, Missouri. Flood control in the Missouri River basin was the primary purpose for which the dam and reservoir project was authorized.

Incidental authorized uses included the establishment of public recreational areas with access to the margin of the reservoir (hereinafter referred to as access areas). The land involved here was taken for use as an access area.

On August 4, 1961, the Court entered its judgment upon the Declaration of Taking, providing for immediate condemnation of title and right to possession and for subsequent ascertainment of just compensation. No question is raised concerning the validity of the taking and judgment of condemnation. The sole questions are the amount and measure of compensation to be awarded the defendant landowners.

### QUESTION PRESENTED

By agreement of the parties the right of the defendant to be compensated for the value of the property as enhanced by the improvement was submitted separately on evidence to the Court without a jury in advance of the trial of the question of amount of damages. The mixed question of law and fact submitted to the Court was stated as follows:

"Whether the plan for taking the subject land was probably within the scope of the project from the time the Government was committed to it, within the meaning of the rule of

the United States v. Miller, 317 U.S. 369, 63 S.Ct. 276 [l. c. 281], 87 L. Ed. 336, l. c. 344."

On the determination of this question depends the right of the landowners to compensation for the value of the property as enhanced by the establishment and construction of the Pomme de Terre Dam and Reservoir project.

## ULTIMATE CONCLUSION ON QUESTION PRESENTED

Upon the evidence submitted and under the controlling decisions the Court has concluded that 28.82 [1] acres of land taken was not probably within the scope of the project from the time the Government was committed to it.

As to the remaining 6.18 acres, it is concluded that the Government is estopped to assert that the defendants are not entitled to value of the property as enhanced by the establishment and construction of the project. Therefore, the defendant landowners are entitled to compensation for the value of the 35 acre tract on August 4, 1961, as enhanced by the establishment and construction of the Pomme de Terre Dam and Reservoir project.

## FACTS

The relevant facts are not in dispute, having been proved by examination of the employees and officers of the plaintiff United States. Their testimony establishes the following facts:

The Government became committed to the project by Public Law 641 (effective July 2, 1956), 70 Stat. 474 et seq. which authorized the project and appropriated funds for its execution.

The original project design is contained in "General Design Memorandum No. 1" dated April, 1953 (Government's Exhibit 1). This design memorandum was not published and was subject to change. It was a preliminary proposal which preceded the authorization of the project by Public Law 641. This design memorandum was prepared under a land acquisition policy (later changed in October, 1953) whereby the United States

generally took land in fee to the "full pool reservoir line" blocked out in 40-acre tracts, taking all of each 40-acre tract partially or wholly within the full pool reservoir line. Under this policy generally no flowage easements were to be acquired. Because this project included hydroelectric power facilities the full pool was a power pool rather than a conservation pool. In this case the full flood pool reservation line was fixed at elevation 879 feet above sea level. The land acquisition plans connected with this original design memorandum will not be noted in detail because the change in land acquisition policy of October, 1953, caused a revision thereof. The land herein question was originally a part of a 40-acre tract scheduled for acquisition in fee because a portion thereof was within the full power pool reservation line. (The defendants owned a larger tract of which the 40 acres was a part.)

In October, 1953, a new land acquisition policy for Civil Works Projects was promulgated by the Chief of Army Engineers (having responsibility for this project). Pursuant to the new policy the land acquisition plans for the project were revised. The new policy revoked the pre-existing policy, described above, and substituted a policy under which, in reservoir projects, the United States took lesser estates. Under the new policy (set forth in Government Exhibit 4) the United States would acquire fee title up to the elevation calculated by the hydrologists to be subject to flooding once in five years (864 feet above sea level in this case). The rationale of this new policy was that this land would have little value for use of the landowner because of its liability to relatively frequent flooding. Under the new policy, above this elevation the United States would acquire a flowage easement, which is the right to flood occasionally up to the full flood pool reservoir line. This new policy also provided that the United States would acquire in fee certain areas for public access.

Under the new policy the land acquisition plans were revised. The revision

[1.] Consisting of 26.75 acre and 2.07 acre parts of the 35.00 acre tract in question.

was dated June, 1956 (Government Exhibit 5) and entitled Design Memorandum No. 5.

## THE 26.75 ACRE PART OF THE TRACT

In respect to the 35 acres here involved, and the 40 acre tract of which it was a part, the revision (dated June 1956) resulted in exclusion of 26.75 acres thereof from the acquisition line for reservoir purposes (Plat No. 2, Government Exhibit 5; enlarged in Government Exhibit 6). This revision of June, 1956, scheduled for acquisition 6.25 acres in fee and a flowage easement in 7 acres, all within the 35 acre tract.

However, this revised Design Memorandum covered the subject of public recreational access areas proposing 20 sites from which 14 were to be selected. The 35 acres involved in the case at bar were not originally included in the 20 possible sites (Government Exhibit 5, page D–8). The final selection of access area was to be made in considerations of location, topography, accessibility to township roads, boundaries of ownership and avoidance of severance. The Missouri Conservation Commission, a co-operating state agency, concurred in the selection of the 20 proposed sites.

By indorsement dated December 26, 1956, detailed instructions were given by the Chief of Engineers narrowing the selection of sites (4th indorsement, Government Exhibit 5). Under this detailed policy the access areas were finally selected and announced in 1960. No special consideration was given to the land of defendant landowners as an access area site, and no attempt was made to acquire it at this time.

Sometime between 1956 and 1961 a master plan for the project was completed, printed and published under date of February, 1961. This plan (Government Exhibit 8, Design Memorandum 17A) included the access areas selected, and included a land acquisition line excluding the defendants' 35 acres here involved from acquisition.

## THE 6.18 ACRE AND 2.07 ACRE PARTS OF THE TRACT

In 1957 the Engineers secured more accurate engineering data concerning the needs for reservoir purposes and revised the real estate acquisition plans and boundaries in respect to the 35 acres in question. The part of the tract to be excluded was increased from 26.75 acres to 32.93 acres by reducing the proposed fee acquisition to 5 acres from 6.25 acres and reducing the proposed flowage easement from 7 acres to 2.07 acres (Government's Exhibit 9, dated July 24, 1957). This was clearly shown by contracting the boundaries of the project to reduce the area affected by the plans from 13.25 acres to 7.07 acres, a difference of 6.18 acres.

Upon the basis of this new boundary the Government bargained with the landowners and acquired on October 10, 1958, by voluntary conveyance title to 5 acres in fee and a flowage easement of 2.07 acres, leaving the 35 acres in question affected by a flowage easement of 2.07 acres. This deed was recorded. The dealings resulting in the voluntary conveyance by defendants were conducted upon the representation by the Government that the entire 35 acres would be excluded from the project as shown by the 1957 revision of the plans (Government Exhibit 9), except for a flowage easement of 2.07 acres. This bargain left the defendant landowners with direct access to the reservoir at the full flood pool level along and over the 2.07 acres, the subject of the voluntarily granted flowage easement.

In the meantime events transpired which resulted in the ultimate judgment condemning the 35 acres in question. In June, 1960, pursuant to a directive, a public hearing was held at Bolivar, Missouri. The location of the 14 selected access areas was announced. Persons residing on the west side of the reservoir commented on the "scarcity" of access area on the west side, where defendants' land was located. As a result of these comments a later meeting was arranged

with the representatives of the public, at which 4 new sites on the west side were inspected. Defendants' 35 acres was one of these 4 sites. Early in July, 1960, another public meeting was held at the Wheatland, Missouri, High School, at which it was proposed by those in attendance that defendants' property be acquired for an additional access area. On July 12, 1960, this proposal was supported by a public petition signed by 465 persons. Finally, on March 3, 1961, the acquisition of the defendants' 35 acres for an access area was authorized by teletype. The first time that the project engineers had any idea of seeking approval of acquisition of this property as an access area was in July, 1960.

## CONCLUSIONS OF LAW

■ As indicated in the statement of the question presented the principle controlling this case is announced in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, in the following language:

"If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

"The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was com-mitted to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities."

■ In the case at bar, the date of final and definite authorization of, and commitment to, this project was July 2, 1956, when Public Law 641 was enacted containing an appropriation of funds for the project. At this time the scope of the project was defined by Design Memorandum Number 5 which had been revised in June, 1956, one month previously (Government Exhibit 5). The 26.75-acre tract in question was excluded from the acquisition land for reservoir purposes. Therefore, that portion of the tract in question was not probably within the scope of the project for reservoir purposes. However, it appears this revised Design Memorandum Number 5 specified the acquisition of approximately 14 public recreational access areas to be selected from 20 potential sites. The 35-acre tract in question was not included as one of the 20 potential public recreational access area sites. If it had been so included as a potential site, it would certainly have been within the scope of the project from the time the Government was committed to it. (As stated above, the tract excluded was increased to 32.93 acres in the revision of 1957).

Under date of February, 1961, a presumably final design memorandum was prepared including the acquisition line for reservoir purposes and the selected public recreational access areas. The land acquisition line resulting therefrom did not include the 35 acres in question (Design Memorandum 17A, Government Exhibit 8) except for 2.07 acres subject-

ed to the flowage easement. As an afterthought, and as a result of public pressure originating in 1960, about four years after the Government was committed to the project and in the month following the publication of the supposedly final design memorandum, the acquisition of the defendants' tract of land for an access area was authorized by teletype.

In the meantime, as noted, in reliance upon the scope of the project as shown by the design memorandum upon which the Government became committed to the project, and in reliance upon the 1957 revised plans the defendants voluntarily conveyed to the United States by deed fee and easement interest in 7.07 acres all within the scope of the project and the land acquisition plans of 1956 and thereafter.

Thus it appears that 26.75 acres of the 40-acre tract in question were not within the scope of the project when the Government became committed to it in 1956. It further appears that the remaining 13.25 acres of the 40-acre tract were within the scope of project by express scheduling of acquisition in fee of 6.25 acres, and of acquisition of a flowage easement over 7 acres (later reduced in 1957 to 5 acres in fee and an easement over 2.07 acres as a result of improved engineering data).

Now the Government condemns for an access area the fee simple title in the 26.75 acres never included, the 6.18 acres eliminated from the project in 1957, and the 2.07 subjected by deed to the flowage easement.

While the 6.18 acres and the 2.07 acres were actually within the scope of the project in 1956, the Government is estopped to assert that the 6.18 and 2.07 acres were not merely adjacent lands subject to enhanced evaluation. It is estopped because of the representations in the 1957 revised plan which resulted in voluntary conveyances of 5 acres in fee and of an easement over 2.07 acres in the belief that the 35 acres had been eliminated for acquisition in fee.

In this connection in respect of the 2.07 acres subject to a flowage easement, the acquisition of the easement did not justify later acquisition of a greater estate upon altered plans in an area including lands not originally in the scope of the project for a later conceived purpose. Calvo v. United States (C.A. 9) 303 F.2d 902.

Moreover for a period of nearly five years between July 2, 1956, and March 3, 1961, the Government had no apparent intention of acquiring the tract in question as an access area.

Under the circumstances it would be a violation of the Fifth Amendment of the United States Constitution to take the defendants' lands for public use without compensation for the enhanced value of the lands at the time of the taking in July, 1961. This is a case where the acquisition of an access area was conceived not as a part of the original undertaking but as an unanticipated afterthought and as an independent enterprise. See 149 A.L.R. 66, l. c. 88–98.

The primary genius of our Government lies in the spirit and letter of our written Bill of Rights which protects the life, liberty, and property of the individual against Governmental power. The Fifth Amendment prohibiting the taking of private property for public use without just compensation is one of the great guaranties of freedom contained in the Bill of Rights.

It is not in the broad declarations of the Bill of Rights that the rights of the individual are secured. It is in the detailed implementation thereof through judicial and administrative procedures. The working rule announced in the case of United States v. Miller to do substantial justice in eminent domain procedures is a salutary one intended to prevent erosion of constitutionally secured individual rights through ineffective and inequitable judicial procedures. It would be a denial of the right to just compensation guaranteed by the Fifth Amendment to deny the right to enhanced value when the United States has made a sudden and

improbable change in the scope of the project over four years after it became committed to the project upon a plan showing definite lines and boundaries for acquisition of property adjacent to the reservoir. This is particularly true when, as in this case, dealings were had with the landowner resulting in voluntary conveyances of contiguous property to the United States on the basis of the apparently definite plans.

■ The representations of the Government involved in the voluntary negotiations estop the Government to assert that any of the 35 acres were within the scope of the project. Reliance upon these representations is implicit in the negotiations for the voluntary conveyances.

Because the acquisition of the 35 acres in question for an access area was an afterthought, occurring about 17 months after the voluntary conveyances for reservoir and flowage purposes and more than four years after Congress approved the plans by authorizing the project and appropriating funds therefor, the case at bar falls within that part of the language of the Miller case quoted above reading as follows:

> "If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity."

It is not necessary to determine to what extent adjustments in the preliminary plans shown by design memoranda existing at the time the Government is committed to the project may be considered to be probable. If the design memoranda were preliminary plans, unsupported by extensive engineering and obviously subject to substantial revision, and if the revision occurs within a reasonable time and before voluntary conveyances, other considerations may apply. But such is not the case here. In this connection see John L. Roper Lumber Co. v. United States (C.A. 4) 150 F.2d 329. Cases applying the principles followed here are Blas v. United States (C.A. 9) 261 F.2d 636; Scott v. United States (C.A. 5) 146 F.2d 131; and Calvo v. United States, supra.

In the trial of this cause the jury should be instructed that the value of the lands taken should be determined as of the market value at the time the Declaration of Taking was filed in this Court, namely, August 4, 1961. This value should be the fair market value of the land taken as enhanced by its proximity to the Pomme de Terre Reservoir.