## JOHN L. ROPER LUMBER CO. v. UNITED STATES.

### No. 5370.

Circuit Court of Appeals, Fourth Circuit.

July 11, 1945.

Gerould M. Rumble, of Norfolk, Va., and R. E. Whitehurst, of New Bern, N. C. (L. I. Moore, of New Bern, N. C., on the brief), for appellant.

R. Brookes Peters, Jr., Sp. Asst. to U. S. Atty., of Wilmington, N. C. (J. Edward Williams, Acting Head, Lands Division, Department of Justice, of Washington, D. C., J. O. Carr, U. S. Atty., of Wilmington, N. C., and Roger P. Marquis and Wilma C. Martin, Attys., Department of Justice, both of Washington, D. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case comes before us on appeal from a final judgment of the District Court in condemnation entered on a jury verdict December 14, 1944, awarding appellant $7,980 as just compensation for 266 acres of land.

Several months prior to the institution of the instant proceedings, Congress, by the Act of March 23, 1941, 55 Stat. 47, 48, c. 25, authorized the Secretary of the Navy to establish a Marine Corps Training Area on the East coast. The site chosen for this Area, now known as Camp Lejeune, is in the vicinity of the New River in Onslow County, near the town of Jacksonville, North Carolina. The "main base," or "Base area proper," is located on the South side of North Carolina Highway 24. The lands of the appellant, John L. Roper Lumber Company (hereinafter called Roper) involved in this proceeding, consisting of 266 acres, are located on the North side of Highway 24, directly across from the Marine Corps Training Area.

On September 11, 1941, the United States, at the request of the Administrator of the Federal Works Agency, instituted proceedings under the Lanham Act of October 14, 1940, 54 Stat. 1125, c. 862, as amended by the Act of April 29, 1941, 55 Stat. 147 c. 80, 42 U.S.C.A. § 1521 et seq., to condemn certain lands of which the 266 acres here involved were a part, for the purpose of housing persons engaged in national defense activities. On the same day a declaration of taking was filed and estimated compensation was deposited in court. Judgment on the declaration of taking and an order granting immediate possession to the United States were entered on September 31, 1941. Since that time the Government has platted and erected a large number of housing units on the lands taken.

On May 3, 1943, Commissioners appointed to determine compensation filed their report awarding $20,000 for Roper's land. Both the United States and Roper filed exceptions to the Commissioners' report and demanded a jury trial. The jury trial resulted in a judgment of $5,000 in favor of Roper. On Roper's motion, a new trial was granted, resulting in the verdict and judgment involved in this appeal.

The District Judge gave the following instruction to the jury:

"If you find from the evidence, and by its greater weight, that the lands formerly owned by the Respondent, John L. Roper Lumber Company, probably were within the scope of the Marine Base project from the time that the Government was committed to the acquisition of said project, then said respondent would not be entitled to receive any increase in' the value of Tract No. 1 herein arising from the fact that the same probably would be condemned or otherwise acquired by the Petitioner. In other words, if Tract No. 1 was within the area where it was likely to be taken for the project, the owners are not entitled to an increment of value occasioned solely by its proximity to the lands previously taken for the Marine Base project."

Two questions are raised on this appeal: (1) Was it error for the trial court thus to instruct the jury? And (2) was there sufficient evidence, in the light of this instruction, to support the verdict?

In the usual exercise of the power of eminent domain, the value of the land sought to be condemned is the value at the time of the taking, Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240; United States v. Rogers, 255 U.S. 163, 41 S.Ct. 281, 65 L.Ed. 566; United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063, yet the ascertainment of a market value fairly determined demands some qualification of this broad principle when the value of the lands taken has been greatly enhanced by reason of the Government's own activities. See Miller v. United States, 317 U.S. 369, 376–379, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; Tigertail Quarries, Inc. v. United States, 5 Cir., 143 F.2d 110. The sound rule, and one by which we are bound, was clearly prescribed by Miller v. United States, 317 U.S. 369, 376–7, 63 S.Ct. 276, 281, 87 L.Ed. 336, 147 A.L.R. 55. The Supreme Court there said:

"If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

"The question then is *whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it."* (Italics ours.)

■ Landowners should not gain by speculating on a probable increase in value due to the Government's commitment to a particular project. See Miller v. United States, supra. Cf. United States v. Lambert, 2 Cir., 146 F.2d 469, 472; Cameron Development Co. v. United States, 5 Cir., 145 F.2d 209; United States v. Foster, 8 Cir., 131 F.2d 3. 6. The instruction given to the jury by the trial court was, we think, entirely proper. It hewed quite closely to the rule prescribed by the Miller case.

■ It is admitted by Roper that its claim for just compensation for the land taken includes the increment in value resulting from the establishment of the Marine Base. It is strenuously urged, however, that the taking of its land was clearly not within the scope of the original project; that the taking of the land for a housing project was an entirely separate and distinct purpose, and was carried out by a different agency of the Government.

We find no merit in the second contention. We cannot believe that the rule set forth in the Miller case should be nullified by the mere chance that an agency of the Government different from the one for whose use the land is taken, should, by reason of the fact that it holds available funds, be directed to institute condemnation proceedings.

■ As to the first contention, the question of the scope of the original project was fairly submitted to the jury, cf. Scott v. United States, 5 Cir., 146 F.2d 131, and it is obvious from the verdict that a finding contrary to Roper's contentions was made. Further, we are of the opinion that the evidence amply supports the jury's verdict.

The fact that the original plans for the Marine Corps Area contemplated a housing project is not disputed. The need, at such an extensive operation, and in such a remote area, for special housing of personnel is obvious.

The testimony of witnesses for the Government, and two separate juries chose to believe them rather than witnesses for Roper, clearly supports the jury's belief that the taking of Roper's land was probably within the scope of the project in its preliminary stages.

Lieutenant Commander E. D. Smith, assistant to the officer in charge of construction, and one familiar with all active planning, in answer to the question: "Commander, will you tell us what were the plans for housing facilities for the enlisted personnel?" stated: "In the very early plans for the project housing for enlisted personnel was included within the main Base area proper. During the early stages there was some discussion as to whether it would be there or perhaps outside; and prior to any planning for housing—that is, the construction of houses for enlisted personnel—in the area, it was decided to go into the present location."

Further, in answer to the question: "Can you tell us when that was so considered, Commander Smith?" he stated: "I would say in the early part of July, 1941, the decision to go outside the Marine Base area proper was arrived at."

Brigadier General W. B. T. Hill, United States Marine Corps (at the time of the incidents in question, a lieutenant colonel), testified in part as follows:

"Q. Will you tell his Honor and the Jury your duties there? A. On the 17th of March, 1941, I was assigned as liaison officer for new construction. It was within my duty and prerogative to approve all plans, locations, building plans, and utilities in connection with the building program.

"Q. General, in connection with those duties, did the location of the housing project fall within your duties? A. It did. The location of every building on the Base fell within my duties.

"Q. Now, sir, can you tell us the earliest time when the location of the housing project at the site where it is now located was considered? A. The 11th of April, 1941.

"Q. Do you have a map showing the location? A. I do.

"Q. Will you refer to it, please, sir, and tell us what took place? A. This is the map. This (indicating) is called Area O in the Land Acquisition Program. On the eleventh of April, 1941, Mr. John W. Hyde, from the Federal Housing Authority, came to Jacksonville. I took him for a short ride. At that present time we were constructing a tent camp. I pointed out to him and invited his attention to the type of construction that usually accompanied a Gov-

ernment camp. I took Mr. Hyde in my car, showed him this location, and told him: 'There is where I propose to put in a lowcost defense housing.'

"Q. Does that involve the Roper Lumber Company land? A. Yes, sir.

"Q. I believe that area to which you are pointing your finger is indicated on the map by red pencil, is that correct? A. I put that mark on the map on the 11th of April, when I was talking with Mr. John W. Hyde."

Much reliance is placed by Roper on a map presented in evidence, in support of its contention that the final decision as to the location of the housing project was not within the contemplation of the original project. In regard to this map General Hill testified as follows:

"Q. Is that a preliminary map that you have there? A. Yes sir.

"Q. Is it? A. This is a very preliminary map.

"Q. By a 'preliminary map' what do you mean? A. I mean that three officers came down to New River, and this was their idea of the way in which the Base should be developed. There were no engineering data supporting this map; it was purely an opinion, from official inspection, without any engineering data for utilities or anything else."

It is true that had the boundaries of the original project been definitely delineated, or fixed by the Act of Congress authorizing the project, then the lands might be considered merely adjacent to the Main Base Area and would be entitled to the unearned increment. Miller v. United States, supra. That, however, was not true here. The scope of the project was of a rather nebulous nature within the outer limits of some 600,000 or more acres. Further, a large amount of discretion was lodged in General Hill as to the particular needs and locations.

In view of the proximity in time, of all the events that happened during the year 1941, the jury might well have considered the taking of Roper's land to be an integral part of the whole project. In summary we find: in March, Congress had authorized the construction of a very large base for housing and training Marines in the vicinity of the New River. In April, condemnation proceedings were begun by the Navy to acquire part of the lands needed for that project and Roper's land had been designated as a proposed site for housing. In July it was definitely selected for that purpose and appraisals made. In September, less than six months after the Marine Base project was begun, and while the base was under construction, proceedings were instituted by the Federal Works Agency to acquire Roper's land. It is not without importance that Roper's land was not the last of some fifteen areas against which condemnation proceedings were instituted.

We find no merit in Roper's contention that it was prejudiced adversely by the trial court's instruction that the jury should weigh the fact, in considering his testimony, that Herritage was general manager of Roper. Such an instruction is clearly within the discretion of a federal judge and there was no abuse of this discretion.

Nor do we consider it necessary to discuss other exceptions raised by Roper since they relate to the exclusion of evidence which becomes vital only in the event Roper's other contentions are sustained. Such is not the case.

The judgment of the District Court is affirmed.

Affirmed.