UNITED STATES of America,
Appellant,

v.

Arlo C. CRANCE, J. V. Crance, Ralph O.
Crance, Minnie Newport, Rose B. Mc-
Kee and Elizabeth Miller, Appellees.

No. 17514.

United States Court of Appeals
Eighth Circuit.

Feb. 11, 1965.

Rehearing Denied March 9, 1965.

Roger P. Marquis, Dept. of Justice, Washington, D. C., made argument for the appellant and filed brief with Ramsey Clark, Asst. Atty. Gen., Richard N. Countiss, Dept. of Justice, Washington, D. C., F. Russell Millin, U. S. Atty., and David M. Proctor, Jr., Asst. U. S. Atty., Kansas City, Mo.

Frederick Beihl, of Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., made argument for the appellees and filed brief with Edgar Shook and Everett A. Olson, Jr., of Shook, Hardy, Ottman, Mitchell, & Bacon, Kansas City, Mo.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

The United States Government acquired from the Crance Estate by condemnation 35 acres of land in Hickory County, Missouri, for use as a public access and recreational area in connection with construction of the Pomme de Terre Dam and Reservoir. The condemned property was part of a 132.5 acre tract of land abutting the reservoir and owned by appellees. Prior to the condemnation proceedings, the Government had acquired 5 acres of this original tract in fee and a flowage easement on

2½ acres, leaving 127.5 acres in possession of appellees.

The parties agreed to submit to the District Court in advance of jury trial the issue as to whether compensation for the condemned acreage was subject to the rule in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) which precludes an enhanced evaluation because of the land's proximity to the project if the land was probably within the scope of the project from the time the Government was committed to it. The District Court found from the evidence that the condemned property was not within the probable scope of the project at this time, and, therefore, valuable as lakefront property enhanced by its proximity to the reservoir. [214 F.Supp. 792 (W.D.Mo.1962)] Thereafter, the jury found the enhanced value of the 35 acres in question to be $17,500.00, and from this verdict, the Government has appealed.

The Government submits that the District Court erred (1) in permitting an enhanced award created by a Government improvement; (2) by invoking against the Government the doctrine of estoppel; and (3) in misinstructing the jury on the meaning of "special benefits."

Plans for a dam and reservoir project of this nature are first tentatively prepared by the United States Army District Engineers. Thereafter they are submitted to the Division Engineer for review, and finally to the office of the Chief of Engineers for his modification, rejection or approval. The first design memorandum of the Pomme de Terre Reservoir was prepared pursuant to the then existing policy whereby the Government acquired land up to the full flood pool reservoir line blocked out in 40 acre tracts, taking all of any 40 acre tract which lay partially or wholly within the full flood pool line. Under this policy, the 35 acres here involved would have been acquired in fee by the Government for reservoir purposes. However, in October, 1953, the Government established a new land acquisition policy providing for the taking of fee title for reservoir purposes up to a land elevation calculated to flood once in five years and the taking of flowage easements up to the full flood pool line. Under this new policy, the Government revised downward the amount of land to be taken from the Crance property for reservoir purposes to 6.25 acres in fee and flowage easements to 7 acres above the fee line. Later in 1957, after further engineering study, the amount of the Crance land to be taken for reservoir purposes was reduced to 5 acres in fee and 2.07 acres in flowage easement. The Government acquired the 5 acres in fee and the 2.07 acres in flowage easement from the Crance Estate by voluntary sale and purchase on October 10, 1958.

From its inception this project contemplated, in addition to the dam and reservoir, recreational facilities for public use around the reservoir. The rule of thumb then existing for lands to be taken for recreational areas was one such area approximately every five miles of shoreline. This rule later became a directive incorporated in the engineers' manual. The public recreational areas were to consist of from 20 to 40 acre tracts, and were to be located at sites depending on a number of factors—topography of the land, accessibility to roads, avoidance of severage, depth of water, scenic qualities, location in respect to other sites, the effect of a drawdown of the conservation pool, and tree cover. The object was to acquire accessible public recreational areas that could be utilized year around for aquatic sports, overnight camping, boat ramps and group shelters.

Under the Government's original land acquisition policy providing for the taking of all of a 40 acre tract when any of it was needed for the reservoir, their could well have been sufficient surplus area acquired for public access and recreational purposes. This was not the case, however, under the new policy. The new policy specifically authorized the tak-

ing of additional lands in fee for this ancillary purpose.[1]

In June of 1956, a memorandum originating at the District Engineers level was submitted containing a list of fourteen potential sites for public use areas selected from over twenty such sites considered around the reservoir. The office of the Chief of Engineers reduced this number to eight, excluding two proposed sites within one and one-half miles of the Crance property. At that stage, the 35 acres involved was not considered. The rejection of these two areas on the west side of the reservoir left no recreational areas in the vicinity of the Crance property for a shoreline distance of twelve to fifteen miles.

The Government does not publicize its proposal for recreational areas until after a public meeting is held to receive suggestions and criticisms from members of the community affected regarding the over-all plans for the reservoir. In June of 1960, the public was notified that a tentative plan for recreational areas had been developed and comment and suggestions would be invited at a subsequent hearing. On June 27, 1960, some one hundred forty-seven persons attended the hearing and were informed of the project's plans generally and that it was about 67% complete with some 82% of the real estate acquired. Maps were displayed showing the proposed eight public use areas. Those attending were advised that all suggestions be made at this meeting so the Engineers could forward the plan to higher authority for final approval. Various persons present suggested that the plan for the west side of the reservoir in the vicinity of the Crance property failed to provide for a suitable public use area. A petition to this effect was submitted to the Engineers signed by some four hundred sixty-five persons.

Thereafter, a representative of the District Engineer together with a committee of the public inspected four additional sites, one of which was the 35 acre tract in question. Another public meeting was held on July 12, 1960 announcing consideration of these sites. From the four sites inspected, the Crance 35 acre tract was selected and proposed as a public use area. The reports of the public meetings were duly forwarded to the Chief of Engineers who authorized the acquisition of the 35 acres on March 3, 1961.

Due to the Government's inability to obtain the 35 acre tract by voluntary purchase, the instant condemnation proceedings were instituted.

The threshold question is whether land taken by eminent domain for an integral part of a Government project should be valued at an enhanced price because of proximity to the project, when the land taken was not specifically delineated at the time of authorization of the project, yet located in an area where it might likely be acquired.

Public access and recreational areas were from the very beginning an integral part of this project. The first design memorandum in 1953 prepared under the then existing governmental land acquisition policy included the Crance property to be taken in fee. The new land acquisition policy, however, became effective prior to the appropriation act of the Congress by Public Law 641 effective July 2, 1956. At the time of the congressional act, there existed a "Design Memorandum" including maps delineating the lands recommended to be taken under the new policy. This was not a final or approved plan, but did indicate the Engineers' projection of the fee line subject to flooding during five year periods and the flowage easement line subject only

---

1. Extract from Government real estate land acquisition policy for Civil Works projects distributed October 12, 1953 appearing in Govt. Ex. No. 4:
 "1. Lands to be acquired in fee. The fee title will be acquired to the following lands:

\* \* \* \* \*

"d. Additional lands which may be needed to provide for limited public use and reasonable access in accordance with applicable laws, or for operation and maintenance of the project."

to occasional flooding. A part of the Crance property was within the fee and flowage easement lines.

The contention of appellees is that the Government is bound by this map on the theory it did not indicate that all of the Crance property would be taken for reservoir purposes, and, therefore, the remainder of appellees' land was outside the scope of the project and entitled to any enhanced evaluation resulting from the governmental expenditures. The demarcation on the map was at most a preliminary drawing. It was not a final delineation of the total project area inclusive of recreational sites because it had not been approved by the Chief of Engineers. Until such approval by the Chief of Engineers the work products of the District Engineer and the Area Engineer are mere recommendations subject to revision.

It is true that by this time the District Engineer had considered some twenty sites for possible access and recreational purposes which did not include the Crance property and had recommended fourteen for approval. The Chief of Engineers rejected all of the proposed sites with the exception of eight and required resubmission for approval of any deviation.

Appellees further contend that by reason of the Chief of Engineers' approving eight such sites without consideration of the Crance property, the Crance property was excluded from the project as a recreational site. Appellees' position is untenable for several reasons. First, this was not a final plan. It was not until later in 1957 that an engineer was selected to prepare the master plan for recreational purposes. Furthermore, the Chief of Engineers' admonition to resubmit deviations corroborates the lack of finality of the recreational plan at this stage. Additionally, this tentative selection occurred before a public meeting was held to brief the community on the over-all reservoir plan and obtain their suggestions and criticism particularly with respect to recreational features. In fact, the public meeting resulted in a committee being formed to accompany a representative of the District Engineer on an inspection of the west side of the reservoir to consider potential public access and use areas in the vicinity of the Crance property where a deficiency of such areas existed by reason of rejection of two previously proposed sites. There followed another public meeting and of the four additional sites examined, the Crance property was recommended as the most suitable. This site was ultimately approved by the Chief of Engineers.

Neither the fact that a line on a map tentatively projecting the reservoir boundary at the Crance location nor the fact that other recreational sites were approved prior to the selection of the Crance property would justify application of a different and higher standard of evaluation to the Crance property. To hold, in effect, on a project of this type that simply because this particular tract of land was not delineated on a map at the time of appropriation of funds for the project by Congress, it had been excluded, would be giving undue weight to the proposed diagram of the reservoir plan. Actually, there is no practical way to absolutely delineate with finality the areas abutting the reservoir line at the inception of the project which would be most suitable for recreational purposes. Extensive engineering studies must first go into the planning for the dam and reservoir. Moreover, the fact that the proposed perimeter of the reservoir was changed from the boundary depicted by the map that existed at the time of congressional authorization after subsequent engineering study demonstrates this very problem. The unreliability for surrounding land evaluation purposes of such preliminary maps when unsupported by extensive engineering data is aptly illustrated in John L. Roper Lumber Co. v. United States, 150 F.2d 329 (4th Cir. 1945). In that decision the Government was held not bound in a condemnation proceeding by a preliminary map prepared by certain officers of the Marine Corps who were inspecting a proposed

site for a military installation. Although the map did not include the adjoining land ultimately condemned for a military housing project, the fact that it was unsupported by engineering data and because the original plans of the installation contemplated such a housing project, the landowner was denied any enhanced value as a result of his land's proximity to the improvement.

The dam and reservoir are the more important aspects of the project and their space requirements in the instant situation necessitated the dislocating of four hundred families. Not until the reservoir lines are finalized, can there be a practical final determination as to the number and location of the necessary recreational sites.

The significant factor here is that this project contemplated recreational areas from its very inception and certainly property lying beyond a perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the reservoir alone was not also sufficient for recreational utilization. Since the Crance property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use. Therefore, the rule in Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893) precludes the increment in value in computing just compensation. In that case, the authorization was for the Government to take a tract of land for park purposes not exceeding two thousand acres lying on both sides of a stream and within certain limits. The land to be taken was not delineated but the general area and confines were. There is no legal distinction between Shoemaker and the instant case, except in that situation the general area of taking within certain lines was delineated, whereas here the encompassing delineation was obvious from the boundaries of the reservoir area.

Miller, supra, 317 U.S. at 379, 63 S.Ct. at 282 cites Shoemaker with approval:

"In the Shoemaker case the court excluded any increment of value arising out of the fact that Con-gress had authorized the location and condemnation of land for the park, for the very reason that Shoemaker's property lay in the area within which the park was to be laid out. If, in the instant case, the respondents' lands were, at the date of the authorizing Act, clearly within the confines of the project, the respondents were entitled to no enhancement in value due to the fact that their lands would be taken. *If they were within the area where they were likely to be taken for the project, but might not be, the owners were not entitled, if they were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken. In so charging the jury the trial court was correct.*" (Emphasis supplied)

In United States v. Rayno, 136 F.2d 376 (1st Cir. 1943), the landowner was also denied market value of his land for other than agricultural purposes despite his contention he was entitled to the benefits of evaluation due to the nearby construction of a dam from a peculiar soil deposit to be excavated from his property. Applying the Miller doctrine, the court concluded that acquisition of the land was probably within the scope of the flood control project from the time the Government became committed to it, because the special soil deposit which the condemned land contained was contemplated as needed to build the type of dam upon the place selected.

It is rudimentary in condemnation proceedings that a landowner cannot claim a benefit from a proximate improvement when inclusion of his land in the improvement from the outset renders impossible enjoyment of the claimed benefit. See, e. g., St. Louis Elec. Terminal Ry. Co. v. MacAdaras, 257 Mo. 448, 166 S.W. 307 (1914).

The Fifth Amendment does not contain any standard of fairness for determining "just compensation." United

States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949). The so-called working rules of judicial expressions are nothing more than efforts by the judiciary for arriving at equitable awards under varying circumstances. The Supreme Court stated in Bauman v. Ross, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897), "Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual * * *." In the later case of United States v. Commodities Trading Corp., 339 U.S. 121, 124, 70 S.Ct. 547, 94 L.Ed. 707 (1950), cited with approval in United States v. Virginia Electric & Power Co., 365 U.S. 624, 631, 81 S.Ct. 784, 789, 5 L.Ed.2d 838 (1961), the Supreme Court stated, "The word 'just' in the Fifth Amendment evokes ideas of 'fairness' and 'equity' * * *."

It would be an unfair cost to the public to allow appellees an enhanced value under the circumstances. The property condemned was taken during construction from an area of probable acquisition for fulfillment of a recreational purpose which was within the scope of the project from its inception.

The District Court found that because of the Design Memorandum in existence when Congress appropriated funds for the project, 8.25 acres of appellees' lands was within its scope. The District Court ruled, however, that the Government was estopped to assert that this 8.25 acres was not subject to enhanced valuation, because representations in a revised plan resulted in the voluntary conveyance of 5 acres in fee for the reservoir by appellees who were thereby led to believe their remaining 35 acres had been excluded from fee acquisition. The District Court's ruling is based on the assumption that the original and revised Design Memoranda represented final plans delineating the entire project.

 None of the tentative maps, oral representations or deeds of the Government agent who negotiated the purchase for the reservoir of a part of appellees' property could have operated to estop the Government. The record is barren of any evidence that appellees relied on either a map or other representation by the Government agent in consummating this sale. Thus, the essential elements of estoppel lack evidentiary support. See California State Board of Equalization v. Coast Radio Products, 228 F.2d 520, 525 (9th Cir. 1955). Furthermore, there is no evidence that the Government negotiator had authority to bind the Government. We held in United States v. Hoffart, 256 F.2d 186 (8th Cir. 1958) that the Government is not bound by unauthorized acts of its agents. The Supreme Court said, speaking through Mr. Justice Frankfurter, in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947):

"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."

We therefore find that under the evidence the District Court erred in applying the doctrine of estoppel.

The District Court instructed the jury, in effect, that for benefits to be special, they must be such as not enjoyed generally by other tracts of land in the neighborhood, no portion of which is taken for the public use area.[2]

---

2. "Now, what do we mean by special benefits? The Court instructs you that the term special benefits, as used in these instructions, means any benefits causing an increase in the market value of the 92½-acre tract of land directly by reason of its position in relation to the Wheatland public access area, and which benefits are not enjoyed generally by other tracts of land in the neighborhood,

no portion of which land is taken for said public access area, and such benefits are special and not (Tr. 411) general benefits, although conferred, and if you find that the benefits of the access area are general to the larger area of land in that vicinity or to the public generally, they would be public or general benefits and not special benefits."

It is settled that special benefits do not become general merely because other lands in the area are similarly benefited. United States v. River Rouge Improvement Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1926); United States v. 2.477.79 Acres of Land, 259 F.2d 23 (5th Cir. 1958); Aaronson v. United States, 65 App.D.C. 14, 79 F.2d 139 (1935). The District Court's definition of "special benefits" is inaccurate.

The judgment is reversed and remanded for proceedings not inconsistent with this opinion.