Donald WHATTOFF and Vernard Whattoff, d/b/a Whattoff Motor Company, a copartnership, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17888.

United States Court of Appeals
Eighth Circuit.

Jan. 10, 1966.

As Amended on Denial of Rehearing
Feb. 4, 1966.

Joseph H. Buchanan, Ames, Iowa, made argument for appellants and filed brief.

Howard J. Feldman, Atty., Tax Div., Dept. of Justice, Washington, D. C., made argument for appellee and filed brief with Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Tax Div., Dept. of Justice, Washington, D. C., and Donald A. Wine, U. S. Atty., Des Moines, Iowa.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This appeal is from taxpayers' action against the United States for recovery of manufacturer's excise tax alleged to have been illegally assessed and collected. The Government counterclaimed for the same type taxes for prior years.

After hearing the case on stipulated facts, the District Court dismissed taxpayers' complaint and sustained the Government's counterclaims. We affirm.

Taxpayers, a copartnership in Ames, Iowa, operated a franchised Studebaker dealership and a complete repair shop. In 1953, taxpayers ventured into the modification of Studebaker trucks, converting them into specialty vehicles designed for and capable of pulling varisized mobile homes. The principal feature of the modification process was creation of a telescopic truck frame which enabled the truck operator, in a matter of moments to lengthen or shorten the frame and wheel base to best accommodate the size of the mobile home to be transported. In conjunction with the modification, rear fenders were constructed and attached to the trucks. All the modified trucks were sold at retail with the sales price varying as much as two hundred dollars.

The District Court ruled:

(1) That the fenders manufactured and attached to the trucks during the modification process were subject to the manufacturer's excise tax on motor vehicle "parts and accessories," pursuant to § 4061(b) of the Internal Revenue Code of 1954 and § 3403 of the Internal Revenue Code of 1939.[1]

I. As the tax period involved was from January, 1953 to March, 1958, we must apply both § 4061(b) of the Internal Revenue Code of 1954 and § 3403 of the Internal Revenue Code of 1939. There is no significant difference as both impose a tax on parts or accessories for trucks sold by a manufacturer, producer, or importer. The pertinent provisions of these statutes are:

*Internal Revenue Code of 1954:*

"§ 4061. Imposition of tax.

"(a) *Automobiles.*—There is hereby imposed upon the following articles (including in each case parts or accessories therefor sold on or in connection therewith or with the sale thereof) sold by the manufacturer, producer, or importer a tax equivalent to the specified percent of the price for which so sold:

"(1) Articles taxable at 10 percent,
* * *

"Tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer.

* * * * *

"(b) *Parts and Accessories.*—There is hereby imposed upon parts or accessories

(2) Where all sales are at retail and the manufacturer's actual cost exceeds 75% of the retail price, the use of the actual cost as a "constructive wholesale price" is a reasonable and proper implementation of § 4216(b) (1) of the Internal Revenue Code of 1954.[2]

The fenders were fashioned from a steel shell purchased by taxpayers from a steel fabricator. An edge of the shell was rolled down to form a one inch rim. A flat strip of steel one inch wide was welded to the other edge of the shell. Other items were welded together to form fender supports. Holes were bored through the shell and brackets and bolts inserted therein to secure the shell to the brackets. Thereafter, additional holes were drilled to facilitate attachment of rubber flaps. All work was done in the taxpayers' shop. Some of these operations were performed in advance of need but the product was never completed before needed. There was no evidence of any separate sale of the fenders apart from sale of the trucks, and the fenders were not used on any other vehicles.

An applicable Treasury Regulation defines "parts or accessories" as including:

" * * * (a) any article the primary use of which is to improve, repair, replace or serve as a component part of such vehicle or article, (b) any article designed to be attached to or used in connection with such vehicle or article to add to its use or ornamentation, and (c) any article the primary utility of which is in connection with such vehicle or article whether or not essential to its operation or use." [3]

Similar regulations under prior acts have long been upheld as being reasonable. Universal Battery Co. v. United States, 281 U.S. 580, 50 S.Ct. 422, 74 L. Ed. 1051 (1930); Crown Products Co. v. United States, 239 F.Supp. 1009, 1013 (Neb.1965). In Universal Battery Co., supra, the Supreme Court said at 281 U.S. at page 583, 50 S.Ct. at page 423:

"The administrative regulations issued under section 900 uniformly have construed the term 'part' in that section as meaning any article designed or manufactured for the special purpose of being used as, or to replace, a component part of such vehicle, and which by reason of some characteristic is not such a commercial article as ordinarily would be sold for general use, but is primarily adapted for use as a component part of such vehicle. The regulations also have construed the term 'accessory' as meaning any article designed to be used in connection with such vehicle to add to its utility or ornamentation and which is primarily adapted for such use, whether or not es-

---

(other than tires and inner tubes and other than automobile radio and television receiving sets) for any of the articles enumerated in subsection (a) sold by the manufacturer, producer, or importer a tax equivalent to 8 percent of the price for which so sold * * *."
*Internal Revenue Code of 1939:*
"§ 3403. Tax on automobiles, etc.
"There shall be imposed upon the following articles sold by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold:
"(a) [Automobile and truck chassis, etc.] Automobile truck chassis, automobile truck bodies, automobile bus chassis, automobile bus bodies, truck and bus trailer and semitrailer chassis, truck and bus trailer and semitrailer bodies, tractors of the kind chiefly used for high-

way transportation in combination with a trailer or semitrailer (including in each of the above cases parts or accessories therefor sold on or in connection therewith or with the sale thereof), 8 per centum, * * *.
  *  *  *  *  *  *
"(c) [Parts and accessories.] Parts or accessories (other than tires and inner tubes and other than radio or television receiving sets) for any of the articles enumerated in subsection (a) or (b) 8 per centum * * *."

2. See note 4, infra.

3. Treasury Regulations 46 (1940 ed.), § 316.55 were promulgated under the 1939 Internal Revenue Code and made applicable to the 1954 Code by T.D. 6091, 1954–2 Cum.Bull. 47.

sential to the operation of the vehicle."

■ The District Court ruled that the fenders did not lose their identity as "parts or accessories" subject to the manufacturer's excise tax, even though the fenders were produced specifically for use in conjunction with a modification process then regarded as nontaxable by the Government. In so ruling, the District Court relied upon the opinion of this Court in United States v. Armature Rewinding Co., 124 F.2d 589 (8th Cir. 1942), wherein the late Judge Sanborn, speaking for the Court, said on page 591:

"It has, however, become increasingly apparent that the purpose of a taxing act, the probable intent of Congress, the general statutory scheme of taxation set up, and the construction adopted by the Commissioner of Internal Revenue and not rejected by Congress must all be given appropriate effect in determining what meaning is to be accorded a word or a phrase in such an act." (Citing cases.)

The fenders were "parts" within the definition of that term in the regulation. We hold, as did the District Court that the manufacture and sale of the fenders are subject to the tax, irrespective of their specialized use in the modification process.

■ It is equally clear that taxpayers were the manufacturers of the fenders. Section 316.4 of Treasury Regulations 46 (1940 ed.) defines a manufacturer as "a person who produces a taxable article from scrap, salvage or junk material, as well as from new or raw material, (1) by

processing, manipulating, or changing the form of an article, or (2) by combining or assembling two or more articles." Such a regulation has likewise been approved by the courts. United States v. Armature Rewinding Co., supra; United States v. Armature Exchange, 116 F.2d 969 (9th Cir. 1941), cert. denied, 313 U.S. 573, 61 S.Ct. 960, 85 L.Ed. 1531 (1941). See also Vinal v. Peterson Mortuary, Inc., 353 F.2d 814 (8th Cir. 1965).

Taxpayers contend that the manufacture and installation of the fenders were not subject to the tax because those operations were part of the nontaxable modification, and the fenders were not assembled, stocked, or sold as independent parts or accessories. Exemption based upon an absence of independent stocking and selling of the parts or accessories has been rejected by the two circuits in which the question has arisen. Masao Hirasuna v. McKenney, 245 F.2d 98 (9th Cir. 1957); United States v. Keeton, 238 F.2d 878 (4th Cir. 1956), cert. denied, 353 U.S. 973, 77 S.Ct. 1056, 1 L.Ed.2d 1135 (1957). We agree with the conclusion reached by these two courts.

We do not agree that taxpayers are relieved of the tax on the manufacture and installation of the fenders merely because the manufacture was in conjunction with the nontaxable modification of the trucks. To sanction such relief for that reason would amount to a plain circumvention of the statute, and there has been no presentation of authority for such an exception.

The next question for consideration is whether the manufacturers' cost of production is an applicable tax base pursuant to § 4216(b) (1) of the Internal Revenue Code of 1954.[4]

4. This statute was amended by the Excise Technical Changes Act of 1958, § 115 P.L. 85–859, 72 Stat. 1275. The parties agree that the slight variance in the language of the statute and the amendment thereto does not require separate consideration for the period involved. The pertinent provisions of the statute were:
"* * * (b) Constructive sales price—
"(1) In general.—If an article is—
"(A) sold at retail,

* * * * *
the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary or his delegate. In the case of an article sold at retail, the computation under the preceding sentence shall be on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest

From the Committee Report of the House of Representatives pertaining to the Revenue Act of 1932 (H.Rep. No. 708, 72nd Cong., 1st Sess., pp. 32–33 (1939—1 Cum.Bull. (Part 2) 457, 480)), we find that Congress contemplated that the "constructive sales price" could be computed with reference to the manufacturer's cost of production.[5]

An administrative regulation of the Treasury Department implements § 4216 by authorizing the Commissioner to determine a fair market price in cases where the taxpayer has no established pattern of sales to wholesale distributors.[6] A ruling of the Internal Revenue Service authorizes the use of a manufacturer's cost of production as a basis for determining this fair market price.[7] Furthermore, the trial court noted that there had been a consistent pattern of administrative construction of § 4216(b) (1) by other rulings to the same effect.[8]

Section 4216(b) (1) provides that the tax be computed according to whichever of the following prices is the lower: (1) the price for which such article is sold, or (2) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof as determined by the Secretary or his delegate. There is no evidence that during the period under consideration any articles similar to the modified truck chassis were produced for wholesale distribution in the ordinary course of trade or that taxpayers had established a pattern of sales to wholesale distributors. Since there was no wholesale price for the trucks and the statute does not specifically authorize imposition of the tax based on the manufacturers' cost, taxpayers contend that the Government is precluded from assessing the taxes on any basis other than 75% of retail price. Taxpayers should be the first to recognize a fallacy in this argument as the statute does not specifically authorize the imposition of the tax based on 75% of the manufacturers' retail price, the only applicable tax base according to the taxpayers. Since there were no sales of the articles at wholesale, the strict letter of the statute would compel imposition of the tax on "the price for which such article is sold." See § 4216 (b) (1) (A) (i) of the 1954 Code. Since

price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary or his delegate * * *"

5. "* * * the bill requires that every effort be made to ascertain the manufacturers' or producers' price at the place of manufacture or production. In the case of those commodities which are ordinarily sold at wholesale, this price will be the price at which the manufacturer sells to the wholesaler, even though the particular sale is at retail. This price may be established with respect to any particular sale or class of sales, for example, by existing wholesale prices, or by a system of discounts from retail prices, or by a building up from cost of production, whichever method may be the most practical."

6. Temporary Treasury Regulations Under the Excise Tax Technical Changes Act of 1958:
"Sec. 148.1–5. *Constructive Sale Price.*
     ※     *     ※     *     *
"(b) *General rule*—(1) *Sales at retail* * * * Thus, where a manufacturer, producer, or importer sells an article at retail, the tax on his retail sale ordinarily will be computed upon the highest price for which similar articles are sold by him to wholesale distributors. However, in such cases it must be shown that he has an established bona fide practice of selling such articles in substantial quantities to wholesale distributors. If he has no such sales to wholesale distributors, a fair market price will be determined by the Commissioner. In any case the price so determined shall not be in excess of the actual price for which the article is sold by him at retail."

7. Rev.Rul. 54–61, 1954—1 Cum.Bull. 259:
"* * * In any case where the tax base determined in this manner with respect to sales by a manufacturer who sells only at retail results in a price which is less than the manufacturer's cost of the body when in condition ready for delivery to the purchaser, the tax should be computed at 8 percent of such cost."

8. Rev.Rul. 62–173, I.R.B. 1962–42, 7, and Rev.Rul. 62–221, I.R.B. 1962–53, 32.

the vehicles were sold only at retail, this tax base would impose a substantially greater tax than the "cost of manufacturing" basis used by the Government.

By providing for a "constructive sales price," the statute seeks to bring about as nearly as possible a uniform price basis upon which to apply the excise tax rate. In administering the statute to achieve this uniformity, the Secretary or his delegate is authorized to utilize a fair market price in computing the excise tax base. The trial court found that the administrative regulations granting this authority are in conformity with the spirit and intent of the statute.[9] We agree. The practical interpretation of a statute that has been acted upon by the officials charged with its administration should not be disturbed except for weighty reasons. C. I. R. v. South Texas Lbr. Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948). Repeated enactment of a statute without substantial change may amount to an implied legislative approval of the construction placed upon it by an executive officer. National Lead Co. v. United States, 252 U.S. 140, 40 S. Ct. 237, 64 L.Ed. 496 (1920). Regulations reasonable to the enforcement of an act have the force and effect of law if not in conflict with express statutory provisions. Maryland Cas. Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L. Ed. 297 (1919). Computation of the tax on a basis of the manufacturing cost is certainly reasonable as the fair market price of such manufactured articles is normally the manufacturer's cost plus a profit. In dealing with this question where the manufactured article was used by the manufacturer and there was no sale, neither wholesale nor retail, and the tax base was computed on a basis of manufacturing cost, the Ninth Circuit in Technicolor Motion Picture Corp. v. Westover, 202 F.2d 224, 229 (9th Cir. 1953), ruled:

" * * * Since the price at which an article is normally sold in the ordinary course of trade is the manufacturing cost with an additional item of profit, a computation of the tax (where there is a use of the taxed article but no sale of it) which as here is based solely on the cost of construction of the article to the taxpayer is more than reasonable and is tantamount to a fair market price which the Regulations authorize the Commissioner to compute against the taxpayer."

Our conclusion is that the Government was justified in computing the tax on the basis of the manufacturers' cost with an allocation for overhead. That basis represents a fair market price and reflects a reasonable implementation of the statute and accompanying regulations.

Finally, taxpayers assert that the Chief of the Excise Branch in the Office of the District Director of the Internal Revenue Service in Des Moines, Iowa, advised their counsel that the tax base would be 75% of the retail selling price of taxpayers' units. Taxpayers contend that this statement by the Government agent was a determination of the tax base "by the Secretary or his delegate." The District Court, after holding that the tax base be not less than the manufacturers' cost of production, found it unnecessary to determine whether the advice given by the Chief of the Excise Branch in Des Moines was authorized and binding on the Government. The taxpayers have vigorously renewed their argument and we will discuss it briefly.

At the very outset, there is a basic flaw in taxpayers' assumption that the burden was on the Government to show that its agent's statement was not made with authority of the Secretary or his delegate. The opposite is the settled law. It was incumbent upon the taxpayers to determine whether or not this employee was authorized to bind the Government. United States v. Crance, 341 F. 2d 161, 166 (8th Cir. 1965). In Crance, we quoted from the Supreme Court opinion in Federal Crop Ins. Corp. v. Merrill,

9. See notes 6 and 7, supra.

332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947):

"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." 332 U.S. at 384, 68 S.Ct. at 3.

■ There is no evidence that the Government employee in Des Moines had any authority to bind the Government. Even if this had been an authorized official ruling, the Commissioner would still have had the right to revoke the rule and apply a proper one retroactively. Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). See also Martin's Auto Trimming, Inc. v. Riddell, 283 F.2d 503, 506 (9th Cir. 1960) and cases there cited.

The judgment of the District Court is affirmed.