### UNITED STATES of America
v.
### 327 ACRES OF LAND, situated in MURRAY COUNTY, GEORGIA, and John Campbell Mabem, John Brindie and Tax Collector of Murray County.

Civ. A. No. 2056.

United States District Court,
N. D. Georgia,
Rome Division.
Jan. 4, 1971.

---

John W. Stokes, Jr., U. S. Atty., Julian M. Longley, Asst. U. S. Atty., Atlanta, Ga., for plaintiff.

J. R. Cullens, Cartersville, Ga., for defendants.

SIDNEY O. SMITH, Jr., Chief Judge.

This is a proceeding in eminent domain to ascertain just and adequate compensation for certain tracts of land condemned by the government in connection with the Carter's Dam Project in northwest Georgia. At pre-trial, it appeared that this particular case embraced a preliminary issue whether the particular taking was within the "scope of the project." Accordingly, a non-jury hearing was conducted by the court in accordance with United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L. Ed.2d 12 (1970) and Wardy v. United States, 402 F.2d 762 (5th Cir. 1968).

## FINDINGS OF FACT

The project in question, The Carters Dam and Reservoir, "is a combination flood control and hydroelectric power project. As an additional feature, the Reservoir to be created will provide opportunities for development of recreational facilities."

Development of the Alabama-Coosa River Basis was conceived in the mind's eye of the Corps of Engineers as far back as 1930. At the time a three-dam system generating some 30,000 KW, was suggested. By 1941, feasibility studies had modified the proposal to a two-dam system, with the power capacity to remain under study, and Congressional authorization to proceed was requested. (G #2, House Document 414, 77th Congress). The project itself was approved in 1945 consistent with budgetary requirements. (G #3, Public Law 14, 79th Congress). There followed an extensive planning period. In 1958, the Federal Power Commission recommended use of a pumped storage reversible type generating unit to increase the hydroelectric output to 104,000 KW. This recommendation was "taken under study," but apparently rejected by the Corps of Engi-

neers at the time. In 1961, the Site Selection Report opted for single-dam conventional generating units producing 96,000 KW and Carters Dam (Plan 1) was recommended. (G #4). At the time the reversible type units, a technological development of the fifties, were still being recommended by the Federal Power Commission. Land acquisition was begun on February 16, 1962, for the dam and power plant sites and completed in 1962. Meanwhile, the Corps of Engineers continued to revise its hydroelectric plans and in September, 1963, raised the generating output to 104,000 KW, still with conventional units. Subsequently, in the fall of 1963, the Federal Power Commission proposals were placed under additional study and it was recommended that three 52,000 KW conventional units be installed. However, the idea of a regulation pool and reversible units was again rejected. See G #5, Raymond study).

In April, 1964, the public meetings in the area were held. At that time it was envisioned that some 1,225 acres, already acquired, was needed for the dam site and adjacent public use and operational area, and some 6,224 acres would be needed for the reservoir and public access areas, plus 170 acres of easement area. (See D #1, Information pamphlet distributed at the meetings). Land acquisition for the reservoir area was begun on January 1, 1964, and completed in 1965. There was no mention of any need for additional acreage for an impoundment area.

In 1964, the Federal Power Commission renewed its efforts to secure approval of increased power generation and the utilization of reversible units. Following a series of meetings during 1964, the Corps of Engineers *for the first time*, on July 25, 1964, accepted the Federal Power Commission recommendation of two 125,000 KW reversible units,

with possible allowance for two additional units for a total of 450,000 KW. (See G #3 supplement to Design Memorandum No. 5).

The acceptance of this plan changed the overall requirements in that the reversible units necessitated the construction of a reregulation dam below the main dam where water is to be impounded to be pumped back into the main reservoir by the reversible units, thereby effectually doubling the generating capacity of the plant. In September, 1964, it was determined that considerable additional land for the impoundment area would be needed and in August, 1965, the land acquisition for this purpose was authorized. (See G #9, Design Mem. No. 12). However, due to a delay in determination of the exact elevation needed for the reregulation impoundment area until August, 1967, no land acquisitions commenced until after that time. It was substantially completed by the end of 1969.

The regulation dam and impoundment area required the taking of 1,075 acres outright and 25 acres of easements. Its location is southwest and downstream adjacent to the main dam and reservoir.[1]

Under such circumstances, does this last taking come within the "scope of the project" or not?

## CONCLUSIONS OF LAW

The so-called *Miller*[2] rule is easily stated. As reiterated by United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970), it provides:

"If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market

---

1. On G #1, it is indicated in green. On the same exhibit, the 1962 acquisition for the dam site is shown in red and the 1964–65 taking for the reservoir itself is shown in yellow.

2. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

"The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities."

While this rule is easily understood in the abstract, it is difficult to apply in specifics. The court knows of no case which delineates uniform factors or standards to be applied to measure "the scope of the project." As stated in *Reynolds:*

"As with any test that deals in probabilities, its application to any particular set of facts requires discriminating judgment. The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use."

Applications of the *Miller* rule in the context of before-the-fact hearings prior to trials for compensation are not numerous. Nonetheless, certain factors have been deemed significant by various courts in dealing with such specific disputes prior or at trial. As stated above, description of the lands in the original plans for the project is not required. See also United States v. Crance, 341 F.2d 161 (8th Cir. 1965); United States v. First Pyramid Life Insurance Co. of America, 382 F.2d 804 (8th Cir. 1967). However, the presence or absence of such contemplated takings at an early planning stage may be relevant. Aviation Investments, Inc. v. Cameron, 350 F.2d 959 (5th Cir. 1965); United States v. 35.00 Acres of Land, 214 F.Supp. 792 (W.D.Mo.1962). From the original and leading Fifth Circuit case of Scott v. United States, 146 F.2d 131 (5th Cir. 1944), the lapse of time (17 months there) between the original and subsequent taking is an obvious consideration if not the sole one. Blas v. United States, 261 F.2d 636 (9th Cir. 1958); Aviation Investments, Inc. v. Cameron, *supra*; United States v. 35.00 Acres of Land, *supra*. *Cf.* Anderson v. United States, 179 F.2d 281 (5th Cir. 1950). The physical location of the land to the project may also be significant. John L. Roper Lumber Co. v. United States, 150 F.2d 329 (4th Cir. 1945); United States v. Crance, *supra*; Aviation Investments, Inc. v. Cameron, *supra*.[3] Beyond such tangibles, a dem-

3. A late taking for recreational areas is apparently easily justified. Practically all government reservoirs now anticipate recreation and conservation as one of the prime objects of any such projects. Specific planning for such uses most often must await determination of problems of land use, access, community needs, reser-

voir elevations, and the like. Consequently, land abutting the reservoir itself is easily susceptible to inclusion in the original project for recreational purposes. See particularly United States v. Crance, *supra*, and United States v. 811.92 Acres, etc., 404 F.2d 303 (6th Cir. 1968) (Reynolds below). However, reality cannot

onstrated change in government policy [4] or the showing that a particular need was obvious from the start [5] might be determinative. Realizing that "discriminating judgment" must vary with the facts of each particular case, other normal considerations might appropriately be the size of the area in question to the project itself, the public, congressional, and internal announcements of its scope [6] and the relationship of the need to the purposes of the project itself. See United States v. 158.76 Acres, etc., 298 F.2d 559 (2d Cir. 1962).

■ Based on the above and considering the evidence presented, the court concludes that the taking of these tracts was not included in the public project from the beginning and the lands were not "probably within the scope of the project from the time the Government was committed to it." To the contrary, they constitute a subsequent enlargement of the project in the taking of which the owners are entitled to any enhancement of value added up to the date of taking by the proximity of the project.

In this regard, the court is persuaded by the fact that the present taking represents a substantial addition (some 15%) to the size of the original project, that its location below the main dam is not reasonably connected to the original reservoir needs, that there was a delay of some four years between authorization for its condemnation and the original authorization in 1961 and a delay of some five years between its beginning

acquisition and original acquisition, and that it did not appear in any design plans or public information releases until long after the project had begun. However, the paramount consideration here is the proven rejection of the regulation dam concept during all planning stages until July, 1964. While it is true that the entire hydroelectric question was under study throughout the period, until that time the Corps of Engineers was firmly committed to the single reservoir conventional generating unit plan for the project. The mere fact that the Federal Power Commission recommendations as far back as 1958 advocated the eventual reversible unit concept does not render its acceptance in 1964 as probable. The important thing is that it was continually studied and consistently rejected until that late date. In context of this project, it constituted a significant change. Almost any change is conceivably "possible"; to be "probable" it must relate to the original project more closely than demonstrated here.

The parties are agreed that the issue of just and adequate compensation is to be determined as of the date of the Declaration of Taking. (See generally as to the determination of "the time of taking" Anderson v. United States, *supra*). Accordingly, upon the jury trial of this issue, evidence of any enhancement of value in the land prior to such date by reason of its proximity to the project shall be admissible upon the directions of the judge presiding.

It is so ordered.

be obviated by an overly broad statement of possible needs. Calvo v. United States, 303 F.2d 902 (9th Cir. 1962).

4. As in Aviation Investments, Inc. v. Cameron, *supra*.

5. As in John L. Roper Lumber Co. v. United States, *supra*, and in Anderson v. United States, *supra*. A prime example of such approach would be the late acquisition of suitable access to a remote

project or remote adjacent recreational areas.

6. Such evidence would be relevant to the issue of intent only. The doctrine of estoppel apparently does not apply against the government in such instances. See United States v. Crance, *supra*, at (2, 3), citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).