UNITED STATES of America,
Plaintiff,

v.

**31.45 ACRES OF LAND, WHITMAN COUNTY, WASHINGTON, and J. B. Evans, et ux., et al., Defendants.**

UNITED STATES of America,
Plaintiff,

v.

**43.50 ACRES OF LAND, WHITMAN COUNTY, WASHINGTON, and Carol Jean Wilson, et al., Defendants.**

Civ. Nos. 3744, 3745.

United States District Court,
E. D. Washington.

May 28, 1974.

Dean C. Smith, U. S. Atty., F. Terrence Flannery, Asst. U. S. Atty., Spokane, for plaintiff.

Minnick & Hayner, Walla Walla, Wash., for defendants.

MEMORANDUM OPINION
AND ORDER

NEILL, Chief Judge.

The Government seeks by a motion in limine to restrict respondents' evidence at trial as to just compensation. Specif-

ically, the Government, under the aegis of United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), asks that respondents be prohibited from including as an element of value of the land herein taken by the Government, any increment in value of such lands attributable to the project for which the lands have been taken.

The project for which lands are being taken is the development of the lower Snake River in southeastern Washington from its mouth at the Columbia River to the confluence of the Snake and Clearwater Rivers in Idaho. The main objectives of this multipurpose development are to provide slack water transportation along that stretch of the Snake River, irrigation and generation of power. To meet these objectives, Congress has approved and financed a system of four dams, fishways, navigation locks and channelization. Inherent in this program is the raising of water levels behind the dams and the resultant inundation of the properties, including the tracks of the Camas Prairie Railroad and a public road. One such dam is the Lower Granite Dam. The pool created by this dam causes inundation of part of respondents' property and the need to relocate the railroad and the county road through respondents' land. To provide for such relocation, the Government in 1964 purchased one tract from some respondents and in 1966 acquired from respondents other tracts by way of eminent domain. In 1972 the government commenced this action to obtain title to respondents' adjacent lands for railroad and road relocations. Thus is raised the issue of a "second taking". A chronology of project plans will serve to delineate the issue.

In 1938 the Army Corps of Engineers submitted a report to Congress on the subject of the development of the Snake River system, which has been commonly referred to as the "704 Report". This report is general and contains no reference to such details as railroad and road relocation. In 1947 the Corps of Engineers submitted a further report to Con-

gress. This report recommended the four dam plan for the lower Snake River and included the matter of relocation of the railroad and the county road. Subsequent Corps reports to Congress gave further detail as to such relocation. All relocation proposals (Design Memoranda) prior to 1970 contemplated relocation of the railroad and the county road adjacent to or near the shoreline of the proposed pool. Between 1938 and 1970 many changes in detail were made in the project, including a raising of the water (pool) level. For purposes of this action, however, it is pertinent to observe that all such changes kept the relocations within the "take line" on which these parties dealt in the 1964 and 1966 land acquisitions.

Between 1966 and 1970, two new factors affected the plans for relocation of the rights-of-way. First, the State of Washington, by legislative action, changed the road from a county road to a state highway. This change altered alignment requirements and increased the width and surface standards for the road. Secondly, port districts requested that road and railroad relocation be away from the river to permit development at the water's edge of grain storage, loading facilities and other industrial developments. This change of location of the road and railroad contravened the recommendations of the Corps of Engineers and was apparently occasioned by the demands of interested agricultural and port groups as well as intercession by some of the state's Congressional delegation. Thus, following the initial acquisition of a portion of respondents' lands in 1964 and 1966, the proposed relocation of the road and railroad was changed. This new relocation required acquisition of these additional lands of respondents.

Respondents do not contest the right of the United States to acquire this additional land, but contend that the additional taking is a change in the project which creates the right to have the jury consider the enhancement of value created by the project. Conversely, the Unit-

ed States contends the project as approved by Congress has always included the relocations and that the decision as to where to relocate the rights-of-way was necessarily not final until all studies were completed, all alternatives were considered, and final plans were approved. The Government also contends that, during this period of time, all property owners along the subject stretch of the river were aware of the probability that the relocated railroad and road could be anyplace between the pool shoreline and the rock bluff of the river canyon.

The pertinent principle laid down in *Miller*, is

If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands. not immediately taken increased in value due to the projected improvement.

The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

The court in *Miller* affirmed the holding in Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170,

If, in the instant case, the respondents' lands were, at the date of the authorizing Act, clearly within the confines of the project, the respondents were entitled to no enhancement in value due to the fact that their lands would be taken. If they were within the area where they were likely to be taken for the project, but might not be, the owners were not· entitled, if they were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken. In so charging the jury the trial court was correct.

Later, in United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12, the Supreme Court held that the issues of whether the subject lands were within "the scope of the project" as set forth in *Miller*, is a question to be determined by the Court.

Respondents call the Court's attention to a number of *Miller* cases wherein district and circuit courts have considered this "second take" issue. e. g. United States v. 327 Acres of Land, 320 F.Supp. 844, 14 A.L.R.Fed. 799 (N.D.Ga.1971); United States v. 2,353.28 Acres of Land, 414 F.2d 965 (5th Cir. 1969); Scott v. United States, 146 F.2d 131 (5th Cir. 1944); United States v. 959.68 Acres of Land, 415 F.2d 401 (3rd Cir. 1969); United States v. 244.48 Acres of Land, 251 F.Supp. 871 (W.D.Penn.1966); Calvo v. United States, 303 F.2d 902 (9th Cir. 1962). Plaintiff cites United States v. Crance, 341 F.2d 161 (8th Cir. 1965), in support of its position. In these cases courts have reached conclusions based on

such factors as the definiteness of project boundaries at the time of Congressional approval of the project, the time lapse between the first and second taking, the information given in public announcements, hearings and publication, and change in governmental policy which expands the scope and object of the project. The varying facts and circumstances facing each court in the cited cases render these cases of doubtful authority for the application of the general principle to the facts in this case. Nichols, in his works on Eminent Domain (4 Nichols, Law of Eminent Domain, 3d Ed., § 12.3151(3) (1971)) summarizes the law as follows:

> If a definite area has already been condemned the market value of the neighboring property is naturally affected thereby. If an enhancement in value results, such property is entitled to the benefit thereof. It follows that if the original project is subsequently enlarged so as to embrace additional property, a parcel involved in the supplemental taking is entitled to the benefit of any enhancement in value which resulted from the original taking. If, however, the public project from the beginning included the taking of certain tracts, but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately taken. Nevertheless, it has been held that, where property is enhanced in value by reason of a public project and subsequently the property is taken for another unrelated project the owner is entitled to recover the enhanced value brought about by the first project.

From its inception this project has been essentially the same, it has not been enlarged, and no public information could lead a property owner to believe that any low lying lands along the stretch of the Snake River would not be a probable object of condemnation. The lapse of some four years between "takes", while extensive, is not so long as to lull property owners into a false sense of security when the entire time span of the project is considered.

■ Respondents make much of the change in plans for relocation of the rights-of-way brought about by public pressures from Port Districts, agricultural groups and the State Highway Department. However, it must be kept in mind that such pressures for change of location were continuous and highly public. The relocations are only a detail in the project and the present relocations are within the geographic perimeter and scope of the original project. The overall plan of the development of the lower Snake River has always included a relocation of this road and railroad to raise them above the dam pool, but within the canyon. It cannot be considered as a change in the project when continuing input of engineering data and continuing pressures to accommodate facilities which are obviously appurtenant to the navigational aspects of the project dictate a relocation well within the obvious confines of the project.

■ Respondents further contend the Government is estopped to assert there has been no change in the Congressionally approved project by the decision to move the relocations towards the canyon wall.

During negotiations between respondents and Government agents following commencement by the Government of the 1966 action, statements and representations were made by the Corps land acquisition office and the Assistant United States Attorney to the effect or in substance that the remaining lands of respondents would have enhanced value by reason of the project. Respondents assert that in reliance on these representations they entered into a stipulation settling that suit without trial and removed an orchard of young fruit trees from the remaining land in anticipation of an industrial use of the property.

■ An extensive discussion of the doctrine of equitable estoppel and the

applicability thereof to the government is found in United States v. Georgia Pacific Company, 421 F.2d 92 (9th Cir. 1970); *also see* United States v. Lazy F. C. Ranch, 324 F.Supp. 698 (D.Ida.1971). Stated broadly, the elements of the doctrine are (1) misrepresentation of a (2) material fact by the party against whom estoppel is asserted, (3) which misrepresentation is not known by the party asserting the estoppel to be false and (4) upon which misrepresentation the party relies (5) with the right to rely thereon, resulting in (6) detriment to that party.

The evidence is uncontradicted that representations were made to respondents at the time of the pretrial negotiations in the earlier (1966) action to the effect that lands of respondents remaining after that taking would have enhanced value by reason of the project and that respondents acted in reliance on such representation. The only arguable issue is whether respondents had a right to rely on the representations by the government agent.

Citizens should be able to rely on statements and actions of government agents. However, as pointed out in *Crance*, a party dealing with a government agent has a duty to ascertain the authority of that agent to bind the Government. The representations of enhanced value of respondents' remaining lands made by the land agent were corroborated by the Assistant United States Attorney. While any statement by the land agent would be suspect as to his authority to bind the Government as to the finality of a "take line", the same representations made to a property owner by an attorney representing the Government during pretrial negotiations in the 1966 eminent domain action are to be viewed differently. There should be no reason for a party to question the authority of the Government's counsel to speak for the Government in a court proceeding under circumstances as existed in the 1966 settlement.

Accordingly, plaintiffs' motion is denied.