**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**62.17 ACRES OF LAND, MORE OR LESS, situate IN JASPER COUNTY, TEXAS, etc., et al., Defendants-Appellees.**

No. 74–3244.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1976.

Roby Haddan, U. S. Atty., Tyler, Tex., Dennis R. Lewis, Asst. U. S. Atty., Beaumont, Tex., Wallace H. Johnson, George R. Hyde, Atty., Edward J. Shawaker, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

M. L. Skelton, Houston, Tex., Anthony G. Brocato, Beaumont, Tex., B. F. Whitworth, Jasper, Tex., for American Lakes & Land Co.

James S. Gilliand, Memphis, Tenn., for Diversified Mortgage Investors.

Addington, McGraw & Lawlis, Jasper, Tex., for defendants-appellees.

Before GOLDBERG, DYER and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

The Government here pursues an appeal from a judgment based upon a jury determination of value in this action to condemn a sixty-two acre tract along the perimeter of the Sam Rayburn Dam and Reservoir in Jasper County, Texas. At issue is whether the trial judge properly found the landowner entitled to compensation for the value which had accrued by the time of the taking to this perimeter acreage because of its proximity to the project. Two possible bases support the inclusion of this element. First, the Government owes such compensation if, on its prior acquisition of a piece of this tract from which it now seeks a second bite, it deducted from the value of the land first taken the value by which the remainder was enhanced. Alternatively, the Government must pay this enhancement value if the sixty-two acres in question are outside the scope of the original project.

The passage of time alone has not solved either of our problems. More than three decades after the Rayburn project was authorized, we return to the trial court these dual tribulations. We find it necessary to remand the first question to allow the Government the opportunity to prove that such a deduction never occurred. We also decline at this time to decide the close question concerning the scope of the project, a question neither fully briefed before us nor resolved factually or legally by the trial judge. A decision in favor of the landowner on either question will support the judgment below; the Government must prevail on both the remanded questions to invalidate the jury's determination of value.

I. Factual and Procedural Background

The trial court wrote no opinion in connection with this jury trial, but the record discloses a chronology which we will briefly narrate. This case is most difficult because we adjudicate in several time frames and under different environmental circumstances. We must take a retrospective picture of an undulating area whose value swells and subsides in counterpoise to a project of uncertain scope. Our transit requires convex and concave lenses. We must look forward and backward from different vantage points. Even if we are given the historical markers and monuments, we must explore for the answer along an analytical contour that provides no straight line to decision.

Congress authorized the Rayburn project in 1945.[1] In 1953, the Department of the Interior and the Army Corps of Engineers adopted a joint policy governing land acquisitions for reservoirs. See 19 Fed.Reg. 381 (January 21, 1954). Pursuant to this "Eisenhower policy", the government would acquire land for dam projects in fee simple up to the five year flood line—the level the water will reach on an average of once every five years.

From 1958 to 1961, the Corps of Engineers moved to implement this policy in acquiring the land necessary for the Rayburn project. In May, 1958, the Chief of Engineers approved a calculation that the five year flood line lay on the contour 171 feet above mean sea level. The 1959 and 1961 design memoranda approved by the Chief set out more precisely the land to be taken; the Government publicly disclosed its intent to acquire fees up to the 171 foot line and flowage easements up to 179 feet at a hearing in Jasper County on December 13, 1960. During this period, the government staked out by tangent surveying the lines of acquisition as drawn in the design memoranda.[2]

Defendant landowner's predecessor in title owned a tract of over 1,800 acres which reached into the project area. In 1961, agents of the Secretary of the Army negotiated a purchase in fee of so much of this property as was included in what was then drawn and staked as the 171 foot contour. At the same time appellant purchased a flowage easement on this tract up to the 179 foot line.

In 1965 it became obvious to the Government that it had committed errors in demarking the 1971 foot line. One development

er's independent survey of his own contour line revealed inaccuracies; moreover, impoundment of the reservoir having commenced, the water rose in 1965 to a level that made clear the need for adjusting the Corps' original line.

Available funds supported only a partial resurvey in 1966. Where practicable, the Government traded tracts it had mistakenly placed below the 171 foot line for equivalent properties erroneously marked above it. This barter would not accomplish all necessary adjustments; Congress in 1969 at last authorized funds for detailed resurveying and consequent acquisitions. By June 1969, the Corps had restaked the perimeter area to reflect what is hopefully a sufficient accurate approximation of the needed 171 foot contour. This case involves the condemnation of lands covered by this adjustment.[3]

In January 1971, defendant American Lakes and Land Company, Inc., purchased that portion of the original 1,800 acre tract that had not been acquired by the Government in 1961. In July 1971, the Government filed this complaint, along with a declaration of taking, seeking to condemn approximately sixty-two acres of land within the 171 foot line as resurveyed in 1969.[4]

■■■ The Government sought by pretrial motion to exclude evidence of any enhancement of the value of the property which was due to the project for which it was being condemned. At a hearing on this motion March 22, 1974, both parties offered evidence and arguments pertaining to the question of whether the sixty-two acres were probably within the scope of the Rayburn project from the time the Government

1. The Act of March 2, 1945, 59 Stat. 10, authorized a larger project for the Neches and Angeline Rivers, including the Rayburn project, originally known as the McGee Bend reservoir.

2. Tangent surveying involves the drawing of tangents between monuments placed on a line believed to be the desired contour level. The method results inevitably in some deviation from the precise contour, but this deviation can be kept so slight as not to impair the method's practicality.

3. As of this taking, the Government was still acquiring lands not involved in the resurveying in the five year flood line; the audit which would mark the finalization of the Rayburn project had not yet begun.

4. This acreage is all below the 179 foot line which has never been adjusted, and it is therefore subject to the flowage easement acquired in 1961. The Government is now seeking full ownership of these sixty-two acres.

became committed to it. If so, the land is subject to condemnation without reference to any enhancement from the project under the well-established rule of *United States v. Miller,* 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. *See United States v. Reynolds,* 1970, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12. In denying the Government's motion at the conclusion of this hearing, the judge did not explicitly find that the land in question was not within the scope of the project; rather he followed an estoppel theory that the landowner now concedes the record cannot support and held that the defendant was entitled to compensation for any such enhancement.[5]

The parties then proceeded to trial on the merits.[6] The jury valued the property prior to the taking at $4,013,000 and after the taking at $3,892,000, resulting in a difference of $121,000, in accordance with which judgment was entered. The Government appealed.

■ At issue in this appeal is whether the "just compensation" which the Fifth Amendment requires the federal Government to pay for condemned property includes the value which had accrued to this sixty-two acres by 1971 because of its proximity to the Rayburn project. The judge below ruled that the landowner should be compensated for this increment of value, which we will refer to as "enhancement";[7] we now proceed to consider two possible bases for affirming this ruling. First is the theory the landowner urges on appeal,

which rests on the fact that the 1971 taking was the Government's second bite out of the tract of land American Lakes now possesses. Second is the argument the landowner made and the Government challenged at the pre-trial hearing, but on which the trial court never ruled—that the sixty-two acres were outside the original scope of the Rayburn project. Regrettably we find that both questions require further development below.

II. The Second Taking from a Single Tract

■ The landowner's "second taking" argument rests upon a single assumption—that the Government, in its 1961 purchase of part of the same tract from which it now seeks an additional sixty-two acres, offset against the value of the property then acquired the enhancement to the remainder which resulted from its proximity to the Rayburn reservoir project. Given that the Government paid less than the market value of the property acquired in 1961 by deducting this enhancement to the remainder, appellee protests that exclusion of enhancement in this subsequent taking will result in less than full compensation for the sum of the acquisitions.

Assuming for the moment that such an offset did occur in 1961, American Lakes' conclusion is correct. A brief hypothetical will illustrate the point. Consider a ten acre tract worth $100 per acre in 1961 without reference to any proposed public

---

**5.** The judge's comments suggest that he felt the Government's mistake in drawing the original 171 foot line estopped it from asserting that the land now sought had been within the scope of the Rayburn project from its original conception. Estoppel may or may not be a rare bird in the aviary of condemnation cases. But whatever the extent to which it may be asserted against the federal government under *United States Immigration and Naturalization Service v. Hibi,* 1973, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7, appellant contends and appellee concedes that the elements of estoppel were not proved below; therefore we look to other arguments for possible grounds for affirming the trial court's ruling on enhancement.

**6.** Before trial, however, the court denied a Government request for leave to take an interlocutory appeal. The Government then sought permission to present evidence of the property's value before the taking both with and without enhancement and to obtain alternative jury findings in order to avoid a second trial in the event this court should reverse the inclusion of enhancement value. Defendant objected that the proposal might confuse the jury, stating he would prefer a second trial if necessary; the district judge agreed and denied the Government's request.

**7.** On the concededly erroneous basis for this ruling below, see note 5, *supra.*

project. Condemnation of the whole would cost the Government $1,000.[8] Suppose the Government takes five acres for a project which enhances the remainder of the tract $50 per acre, paying the $500 value of the acreage taken less $250 enhancement to the remainder, or $250. In 1971 it then condemns the remaining five acres. Excluding any changes in value over time for purposes of the hypothetical, if the Government pays the market value as enhanced, or $750, total compensation to the land owner will be the $1,000 that condemnation of all ten acres at once would have cost. If, however, the Government can pay without reference to enhancement, the remainder would only cost it only $500, for a total outlay of $750 for the ten acres. Clearly, if the landowner is to receive the "full monetary equivalent of the property taken" as required by the Fifth Amendment, *United States v. Reynolds, supra,* 397 U.S. at 16, 90 S.Ct. at 805, 25 L.Ed.2d at 15, any enhancement which has once been offset in a partial taking must be compensated for upon a subsequent taking from the remainder.[9]

8. The Fifth Amendment requires that the owner of property taken for public use receive "just compensation", interpreted as the "full monetary equivalent of the property taken." *United States v. Reynolds,* 1970, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12, 15. The standard measure of that equivalent is market value; "the owner is entitled to the full market value of the property at the time of the taking." *Id. See United States v. Miller,* 1943, 317 U.S. 369, 373, 63 S.Ct. 276, 279–80, 87 L.Ed. 336, 342.

9. *United States v. Crance,* 8 Cir. 1965, 341 F.2d 161, cited by the Government, does not contradict this rule. *Crance* involved the condemnation of thirty-five acres for recreational facilities from a tract of which the Government had previously purchased a smaller portion to be inundated by a reservoir. The court held the landowner not entitled on the second taking to any value stemming from the thirty-five acres' proximity to the reservoir. However, the landowner in *Crance* asserted only that the land was outside the scope of the project; the court rejected this argument. The landowner urged neither factual evidence nor a legal presumption to the effect that enhancement to the remainder had been offset in the first acquisition from the tract. Thus the *Crance* opinion does not speak to the validity of the theory urged by the landowner in the instant case; to the extent

The problem with the landowner's theory as applied to the instant case is thus not its conclusion, but its initial assumption. Once the district judge rested his pre-trial decision to admit evidence of enhancement on an entirely different theory,[10] neither party had reason to offer any evidence at the pre-trial hearing or at the trial as to whether or not any enhancement was actually offset in the 1961 acquisition from defendant's predecessor in title.

The landowner would fill this evidentiary gap with a *presumption* that the Government offset enhancement to the remainder in the original partial taking. He would ground this presumption on the statutory authorization for the Secretary of the Army to negotiate purchases of property sought by the Government for public works projects at prices which reflect a "just and reasonable consideration." *See* 33 U.S.C. § 596.[11] This phrase, according to the landowner, incorporates the requirement of 33 U.S.C. § 595 that, in partial takings by condemnation proceedings, compensation is to be reduced in the amount of the project's enhancement of the remainder.[12]

that the facts of the two cases are parallel, we decline blindly to match up the results.

10. See note 5, *supra.*

11. 33 U.S.C. § 596 reads:
   It is declared to be the policy of Congress that owners and tenants whose property is acquired for public works projects of the United States of America shall be paid a just and reasonable consideration therefor. In order to facilitate the acquisition of land and interests therein by negotiation with property owners, to avoid litigation and to relieve congestion in the courts, the Secretary of the Army (or such other officers of the Department of the Army as he may designate) is authorized in any negotiation for the purchase of such property to pay a purchase price which will take into consideration the policy set forth in this section.

12. 33 U.S.C. § 595 states:
   In all cases where private property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States, and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, where a part only of any such parcel, lot, or tract of land shall be taken, the jury or other

It is true that this court has recently stated that 33 U.S.C. § 595 gave the force of statute to a long standing principle that enhancement of the remainder must be offset in partial condemnations. *See United States v. Trout,* 5 Cir. 1967, 386 F.2d 216. The Court spoke generally:

> [T]he correct measure of value in a case involving condemnation of part of a tract is the fair market value of the entire tract immediately before the taking less the fair market value of the remainder immediately afterwards.

*Id.* at 219.

■ This measure of valuation in partial takings by judicial proceedings, to which the Government can always resort, when combined with the Government's natural desire and duty to deplete the public purse no further than necessary in carrying out its projects does give rise to a presumption that the Secretary fully offsets enhancement to the remainder in negotiating the purchase of part of a tract under 33 U.S.C. § 596. In the context of a negotiated purchase, however, one cannot be certain that the offset took place, and the presumption should not be irrebuttable. Defendant, standing in the shoes of his predecessor, cannot complain of the Government's refusal to pay compensation for enhancement that it never deducted. Just as we cannot permit a single payment for a double taking, we cannot countenance a double payment for a single taking. The Government should therefore have an opportunity to rebut the presumption of full offset.[13]

Indeed, the landowner conceded at oral argument that the presumption he would have us invoke is not irrebuttable. He complained, instead, that the Government had made no effort below to rebut the presumption. The judge below, however, decided to allow evidence of enhancement upon a theory entirely different from the analysis

---

tribunal awarding the just compensation or assessing the damages to the owner, whether for the value of the part taken or for any injury to the part not taken, shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from the improvement, and shall render their award or verdict accordingly.

13. That the fact that the 1961 offset, if any, was made against the defendant's predecessor in title and not against the defendant is irrelevant. As will be further explained in part III, *infra,* defendant need resort to this theory of prior offset only if the land in question was inside the original scope of the Rayburn project; if it was outside, he is entitled to compensation for enhancement on that basis. This "scope of the project" test imposes upon the Government a required level of public disclosure of the probability that a certain tract will be acquired for the project. *See* part III, *infra.* Once the Government has made information public in sufficient degree to meet this test with respect to part of a particular tract, no prospective buyer has reason to pay a price which includes the project's enhancement of that portion of the tract. He would pay such a price in these circumstances, however, if he knew the Government had offset the enhancement in a prior acquisition. Because he has no other basis for expecting enhancement compensation should the Government actually take the land within the project's scope, it is not unduly burdensome to expect him to inquire into the circumstances of the prior taking from the tract to ascertain whether enhancement of the remainder was actually deducted. Thus he has no independent claim, superior to that of his predecessor, of immunity to Government rebuttal of the presumption of prior offset. *Cf. United States v. Dow,* 357 U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109, where the Court, faced with a similar problem in an eminent domain case, stated:

> And whatever may be the equities between the former owner and [the present owner], or between the Government and the former owners, . . . such equities cannot serve to prevent the application of the correct rule of law as between the Government and [the present owner] in this case.

Conversely, an intervening purchase by one with notice, actual or constructive, of the proposed condemnation provides the Government with no equitable claim to freedom from the duty to compensate for what it has once offset. The purchaser, after prudent investigation, may well have had to pay a price reflecting the prior offset. Whether he did or not, the Government is only being held to pay back the enhancement value it is presumed to have offset. The Government is asserting that it failed in the prior acquisition to deduct the enhancement that it could and should have deducted; the opportunity to prove that failure and to rebut the presumption is all it can in fairness claim.

urged here by the landowner.[14] That theory in no way involved, much less rested on, the validity of a presumption that the Government had fully offset enhancement at the prior acquisition, so the Government had no reason to attempt to rebut such a presumption. We can affirm the judgment below on the basis of the prior offset theory only if enhancement was deducted in the 1961 purchase. The presumption urged by the landowner initiates the fact finder on the road to truth. It does not provide him a terminus. The Government must be permitted to re-run the 1961 acquisition in order to expose whether or not enhancement was a quid pro quo in the transaction.[15]

■ In sum, we agree with defendant American Lakes that any enhancement assessed against the remainder in the 1961 purchase must be compensated *pro tanto* upon the taking of the sixty-two remainder acres now before us. Moreover, we presume with defendant that the Government, free to institute condemnation proceedings in which the offset requirement of section 595 would be enforced and anxious to limit its expenditures to the minimum, insisted upon the deduction of full enhancement

value upon its partial acquisition in 1961. The Government thus must bear the burden on remand of demonstrating that anything less than what was then the present value of the enhancement which would accrue to the remainder was actually offset in 1961. If it fails, the measure of compensation followed below, reflecting such enhancement up to the date of taking, was correct; nonetheless, appellant is entitled to an opportunity to meet the burden we have recognized.

III. The Scope of the Project

■ Whether or not the Government should prove able to rebut the presumption that it fully offset enhancement in 1961, there may be an independent basis for affirming the judgment below. This question remains: were the sixty-two acres being taken here within the scope of the Rayburn project at the time the Government originally became committed to it? If this taking is but another reel in the motion picture released in the early 60's, the Government may pay without reference to enhancement; however, if it is a new Corps production, enhancement is owing, and the judgment below was proper. *See United States*

---

14. On that theory, concededly without support in the record, see note 5, *supra*.

15. Remanding to allow the Government an opportunity for rebuttal is not contrary to *Richard v. United States,* 1961, 285 F.2d 129, 152 Ct.Cl. 266, as defendant urges. The court there had previously upheld the Trial Commissioner's determination that seepage from a Government canal had inversely condemned part of claimant's land, but had remanded for a deduction of the canal's enhancement to the remainder. On remand it appeared that another portion of claimant's land had previously been taken through condemnation proceedings in connection with the canal project. The Court of Claims presumed that the mandate of 33 U.S.C. § 595 had been followed by the court that had heard that condemnation action; enhancement of the remainder having been offset against the landowner once, it could not be offset again on this subsequent inverse condemnation.

*Richard* does not render the presumption of offset conclusive in the instant case. First, the prior acquisition here was a negotiated purchase; in *Richard* it was a judicial taking sub-

ject to 33 U.S.C. § 595. Even assuming that the "just and reasonable compensation" stricture of 33 U.S.C. § 596 imposes some duty on the agents of the Secretary of the Army to follow the offset requirement of section 595, one simply cannot be as certain in the context of a negotiated purchase that the parties took enhancement into account. Moreover, the court in *Richard* applied the presumption with almost no discussion of its conclusiveness. Judging from the opinion, the parties apparently did not debate the fact of offset at the prior taking; rather, the court was simply reconsidering an earlier decision entered without knowledge that a prior taking had occurred at all.

Note also that, the conclusiveness of the presumption of offset aside, *Richard* is slightly different on the merits from the argument advanced by defendant here. At issue there was whether enhancement to the property remaining after the second taking should be deducted from the compensation for the segment being taken. No mention was made of a dispute over whether the segment being taken should itself be valued with reference to enhancement.

v. Reynolds, supra; United States v. Miller, supra; Louisiana, Through the Sabine River Authority v. Lindsey, 5 Cir. 1975, 524 F.2d 934; United States v. 2,353.28 Acres of Land, 5 Cir. 1969, 414 F.2d 965.

Pellucidity does not normally attend application of the scope of the project concept; the history of the project before us and the peculiar postures of the parties to this litigation present particularly mind-boggling problems. Both parties focused on this question at the pre-trial hearing on the Government's motion to exclude evidence of enhancement, but the judge in denying the motion did not make an explicit finding that the acreage was outside the scope of the Rayburn project.[16] The Government's initial brief to this court addressed only this "scope" issue; the landowner, however, has responded throughout this appeal solely with the prior offset theory discussed in part II, supra. Nevertheless, we do not find that appellee has completely abandoned the issue. Because the court below reached no explicit conclusion on the scope of the project which is an issue for the trial judge rather than the jury, see United States v. Reynolds, supra, 397 U.S. at 20, 90 S.Ct. at 807; Wardy v. United States, 5 Cir. 1968, 402 F.2d 762, and because ambiguities in the testimony at the pre-trial hearing lie unresolved, we remand this issue also to the district court. We hope to facilitate the proceedings on remand, however, by explicating our understanding of the legal standards triggered by this question.

The Supreme Court's statement of the "scope of the project" test in United States v. Miller, supra, 317 U.S. at 377, 63 S.Ct. at 281, 87 L.Ed. at 344, retains vitality today:

The question then is whether the respondent's lands were probably within the scope of the project from the time the Government was committed to it. If

they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

Applying the Miller test to decide whether a particular acquisition was within reasonable prescience or departed to a totally new vista calls for discriminating judgment. See United States v. Reynolds, supra, 397 U.S. at 21, 90 S.Ct. at 807, 25 L.Ed.2d at 18. This court recently explained in light of Reynolds that project scope is not to be narrowly interpreted. See Louisiana, Through the Sabine River Authority v. Lindsey, 5 Cir. 1975, 524 F.2d 934.[17] While noting, however, the Supreme Court announcement that the land ultimately taken need not have been actually specified in the original project plans to come within its scope, this court did maintain that "[i]t must also be evident to the public that a given tract might be taken for the project." 524 F.2d at 942. The test must have latitudinal and longitudinal tolerances. We cannot straitjacket the government in defining scope of the project, but on the other hand, we cannot permit global meanderings to enclave areas not reasonably to have been conceived as included at its inception.

Examples of the application of "discriminating judgment" in the case reports yield no ready conclusion in the instant appeal, at least in its present state. Most instructive perhaps is United States v. Crance, 8 Cir. 1965, 341 F.2d 161.[18] There the Government purchased seven acres of defendant's

16. See note 5, supra.

17. Though Lindsey involved condemnation by state authorities, Louisiana law had incorporated the Miller test; this court's comments in Lindsey are thus fully applicable to the case at bar.

18. Our rejection of any implications from Crance relating to the prior offset theory discussed in part II of this opinion was not intended as a comment on the Crance discussion of the "scope" test. See note 8, supra.

land in 1958 for inundation by a reservoir project. Though project plans contemplated recreational areas from the outset, both a 1956 preliminary design memorandum and a 1960 proposal of sites approved by the Chief of Engineers did not include any of the remainder of defendant's tract. After a 1960 public hearing announcing the proposal, however, the Government in response to suggestions from area citizens decided to acquire thirty-five acres of defendant's property for recreational purposes. The court found on these facts that the additional acreage was within the scope of the project and subject to condemnation without regard to enhancement, pursuant to this very broad principle;

> The significant factor here is that this project contemplated recreational areas from its very inception and certainly the property lying beyond the perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the reservoir alone was not also sufficient for recreational utilization. Since the Crance property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use.

341 F.2d at 165.

*Crance* implied that until reservoir lines are finalized, a process it recognizes as laden with uncertainties and problems of its own, all property adjoining the proposed reservoir line is subject to being taken for recreational purposes without reference to enhancement.[19] The court reached this conclusion although Government policy on recreational areas called only for the use of tracts 20–40 acres in size located every five miles around the lake. While the certainty of acquisition of recreational property in connection with the reservoir is somewhat greater than the acquisition of perimeter acreage to adjust for errors in surveying the reservoir line,[20] the degree of uncertainty as to the acquisition of any particular tract resulting from the *Crance* standard suggests that finding these sixty-two acres spread along the edge of the Rayburn project to be within its scope would burden landholders with no significant increase in insecurity.[21]

Cases finding property outside the scope of Government projects have involved clearer public statements that final lines have been drawn or less foreseeable types of changes than are present in the instant case. In *United States v. 2353.28 Acres of Land*, 5 Cir. 1969, 414 F.2d 965, an official of the National Aeronautics and Space Administration had previously testified that the land condemned for Cape Canaveral would not extend, for safety and security reasons, beyond a waterway to the north.

---

**19.** Rejecting the landowner's reliance on a design map prepared by the Corps of Engineers at the time of Congressional authorization of the project in 1956, the court in *Crance* also announced that such proposals, until supported by extensive engineering data, were not to be relied on in evaluating surrounding land. The court noted that by the 1960 taking, the perimeter of the reservoir had been shifted following engineering studies. *See* 341 F.2d at 164. *See also John L. Roper Lumber Co. v. United States*, 4 Cir. 1945, 150 F.2d 329.

**20.** The federal government has followed since 1944 a general policy of building recreational areas in connection with reservoir projects. *See Reynolds, supra*, 397 U.S. at 15, 90 S.Ct. at 804, n. 1, 25 L.Ed. at 15, n. 1.

**21.** This court has recently cited *Crance* in approving an expansive interpretation of project scope. *See Lindsey, supra*, 524 F.2d at 942. We continue to reserve judgment on the fullest implications of *Crance's* statement on the ac-

quisition for recreational purposes of any property adjacent to a reservoir. Because factual findings on remand may render it unnecessary, we decline to set out precisely the limits to which we will follow *Crance*. We do wish to point out, however, the relatively low likelihood of acquisition which the Eighth Circuit has found sufficient to indicate that property is within a project's scope.

For an acquisition involving the same low degree of probability as that in *Crance*, see *United States v. First Pyramid Life Insurance Co. of America*, 8 Cir. 1967, 382 F.2d 804. A reservoir project there necessitated relocation of a city water pumping station; the Government had selected a site not including the tracts defendant purchased. Subsequent to that purchase, the proposed site became unavailable, and the Government took a new site from defendant's land, which was near the old station. The court found the acquired area within the probable scope of the project.

He stated that the project would not interfere with this waterway. Confidential reports contained the only evidence of extension beyond the waterway. In that context, we held the taking of defendant's property five miles north of the waterway to be beyond the scope of the project.

This court was aided in that case by *United States v. 172.80 Acres of Land*, 3 Cir. 1965, 350 F.2d 957. There the Government had drawn a reservoir line, and it subsequently took land from the defendant above that line. The cause of the change was not as predictable as a mistake in surveying, however, Rather, the new Kennedy Administration had liberalized Government policy concerning the extent of public development and use of reservoir areas. Finding that the landowner could not reasonably anticipate condemnation of the property above the line, the court found him entitled to the enhancement of value due to the reservoir.[22]

Application of the scope of the project test to the case at bar requires the assessment of three factors: the foreseeability of any change in the reservoir line and of this particular tract's falling within the ambit of such a change; the length of time between the original acquisition and this taking; and the Government representations concerning the finality of the original 171 foot line. First, that some adjustment for error of a reservoir line as originally drawn and staked may be necessary seems a reasonable probability, certainly as contrasted to a change in policy imposed by a new administration. Once some adjustment is viewed as reasonably foreseeable, the taking of this particular acreage was certainly a greater probability than the acquisition of the tracts involved in *Crance* or *First Pyramid, supra*. The sixty-two acres here all lie on the strip between the 171 foot line as originally staked and the 179 foot flowage easement line.[23]

At first blush, the most disturbing factor in suggesting that this taking was within the original scope of the project is the length of time that passed before the Government acted. The reservoir, however, lay dry in 1961. When impoundment began is not clear from the record, but in 1965 the water level evidenced the mistake. Publicly announced Government policy mandates the taking of property for reservoirs up to the five year flood line. *See* 19 Fed.Reg. 381 (January 21, 1954). That the need for adjustments may not reveal itself for five years is therefore likely. This policy is but a reminder that these projects are not of the stop watch variety and that gradualism in acquisition is oft times fact and not fiction.

The delay from 1965 to 1971 could itself take the acreage outside the scope of the project only if it constituted a representation to the landowner that the original 171 foot line on his property did not need adjustment. The resurveying which was commenced in 1966 and the contemporaneous practice of bartering equivalent tracts above and below the mistaken line would seem to preclude such a finding. However, the trial court on remand is free to consider whether, although the adjustment of the reservoir line would otherwise be within the original scope of the project, Government action or inaction after the need for such adjustment became clear made it no longer evident to the public that the taking here might be forthcoming. The scope of the project is not thonged to time. Many years and many men have traversed the Rayburn Reservoir since the project began, however,

22. The Third Circuit has maintained this position in a subsequent case involving a similar acquisition for the same reservoir. *See United States v. 959.68 Acres of Land*, 3 Cir. 1969, 415 F.2d 401.

*See also Scott v. United States*, 5 Cir. 1944, 146 F.2d 131, (holding outside the original scope of an Army training camp an acquisition increasing the size of the camp in connection with the total mobilization for World War II).

23. We do not state that the land subject to a flowage easement was in effect already condemned. There was conflicting testimony below as to its value to a landowner despite the easement. However, the fact that this taking is all within the bounds of the easement is another index of its foreseeability.

and time can be a factor in removing the mote of potential acquisition from the eyes of area landowners.

■ With respect to Government disclosures at the commencement of the project, the record below is ambiguous. Although on any reading the indications that the original 171 foot line would be final were more equivocal than the NASA statements concerning the acquisition of Canaveral, testimony at the pre-trial hearing left unclear whether landowners in 1961 had any indication that the line as drawn was subject to adjustment. Sufficiently definite representations by the Government that the line originally drawn was final could lead to a finding that the acreage here was outside the project's scope regardless of the general probability of mistakes in surveying. Alternatively, statements making it clear to the public that the line might need adjustment could bring the land within the project's scope without need for us to resort to the probability standard announced in *Crance*.[24]

In sum, given the likelihood of some mistakes in surveying and the probability that this perimeter acreage would be subject to adjustment for any such mistake, we would be inclined to find these sixty-two acres within the scope of the project, as we interpret the admittedly-inconclusive prior applications of that test. We recognize that such a holding would burden a landowner adjacent to a reservoir project with some uncertainty, interfering with the accurate valuation of his property until the reservoir lines are finalized.

The alternative, however, would not be certain protection for the landowner. A narrow reading of the "scope" test might well result in public works legislation authorizing the selection of particular tracts from a broadly drawn area which would protect against such eventualities as the adjustment involved here. Tracts selected from which this area up to the completion of the project would fall within its scope. *See Miller v. United States, supra; Shoemaker v. United States*, 1893, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170. The uncertainty to the landowner and the artificial devaluation of his property would be at least as great under such a Government approach to condemnation as under our interpretation of the scope test. Government parsimony in this area is not to be penalized.

The posture of this appeal, however, renders such a holding unnecessary. Ambiguities persist as to the Government's representations to area landowners in 1961 and to the impact of Government activity between 1965 and 1971 on the public understanding of the need for further acquisitions. Resolution of those ambiguities might support findings that these sixty-two acres were either inside or outside the scope of the Rayburn project, without reference to a *Crance*-type assessment of the probability of this acquisition based on the general likelihood of mistakes in surveying and the proximity of this acreage to the reservoir line. Therefore we will remand to allow the district court to resolve the factual ambiguities insofar as is possible and, employing its first hand knowledge of the

24. We remark again, see note 13, *supra*, that resolution of the scope issue will dispose of any claims that the landowner here was a good or bad faith purchaser based on the presence or absence of notice of the proposed additional taking upon his 1969 purchase of the property. If the Government originally placed sufficient information in the public domain to bring the property within the project's scope, then both present and prospective landowners stand on notice that the land is subject to condemnation without compensation for enhancement. On the other hand, if the property in question is outside the scope of the project, the fact of a proposed partial condemnation should not freeze land transfers. A prospective buyer should evaluate the circumstances of the proposed taking to decide what compensation the Government will be required to pay. The Government has no equitable claim to preclude the purchaser from concluding that the taking will be outside the scope of the project, paying a price for the land reflecting that assessment, and asserting the argument on the scope issue against the Government. A successor landowner such as the defendant here may assert the argument, whether or not he paid such an enhanced price. The equities between the owner and his predecessor do not control; the Government will simply be held to the standard imposed by the scope test and no more.

facts, to apply the scope test we have outlined.

### Conclusion

To summarize: Two independent bases will support the judgment below. If the landowner can prevail on either the prior offset theory or the scope of the project question, the inclusion of enhancement value in the compensation awarded was proper. For the reasons stated above, we must remand on both issues. Although the theories are independent, fairness to the litigants and the efficient use of judicial resources counsel that the trial court on remand dispose of both in such proceedings as it finds appropriate. We have endeavored to lay down some geodetic rules for those proceedings in the hope that the mark will not be missed. The judgment below is VACATED AND REMANDED for further proceedings consistent with this opinion.