UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

49.01 ACRES OF LAND, More or Less, SITUATE IN OSAGE COUNTY, STATE OF OKLAHOMA, and the Unknown Owners; and Industrial Western, Inc., Defendants-Appellees,

Robert Duffield, Defendant-Appellee, Cross-Appellant,

Alexander-Frates Company, Diamond Head Property Owners Association, Inc., Diamond Head Development Section 2, Osage County, Oklahoma, and I.D.S. Mortgage Corporation, Amici Curiae.

Nos. 79–1672, 79–1673.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted March 20, 1981.

Decided Jan. 25, 1982.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., and Jacques B. Gelin and Carl Strass, Attys., Dept. of Justice, Washington, D. C., Hubert H. Bryant, U.S. Atty. and Hubert A. Marlow, Asst. U.S. Atty., Tulsa, Okl., with him on the briefs), for the United States.

Bruce W. Gambill of Kelly & Gambill, Pawhuska, Okl., for Robert Duffield.

Remington Rogers of Rogers, Rogers, Honn, Hill, Secrest & McCormick, Tulsa, Okl., for Industrial Western, Inc.

Edwin Kronfeld, Tulsa, Okl. (F. Paul Thieman, Jr., Tulsa, Okl., with him on the brief), of Thieman & Kronfeld, Tulsa, Okl., for amici curiae Alexander-Frates Co., Diamond Head Property Owners Association, Inc., Diamond Head Development Section 2, Osage County, Okl., and IDS Mortgage Corp.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

The United States appeals a district court order approving a condemnation commission report. The report valued the land of Robert Duffield and Industrial Western, Inc. (landowners), at $37,833 as just compensation for the government's taking of the fee simple title to 44.81 acres and a flowage easement over 4.20 acres. Robert Duffield cross-appeals, alleging that the commissioners underestimated the value of his property. The only issues on appeal are (1) whether the district court properly admitted evidence of the enhancement in the value of the property [1] attributable to the existence of the government project, and (2) whether the condemnation commissioners' findings of fact on valuation of the Duffield tracts were clearly erroneous.

In 1950 Congress approved construction in Oklahoma of the Keystone Dam and Reservoir as part of a comprehensive plan for flood control in the Arkansas River Basin. In 1959 the Tulsa District Corps of Engineers issued a design memorandum in which the Corps tentatively designated the land it needed for the project.

The design memorandum states in pertinent part:

"Real Property Taking Line. The tentative blocked perimeter taking line has been established for the fee area (around elevation 754.0 feet, except in remote areas where it is permissive to acquire flowage easements) without the benefit of a tract-by-tract inspection, and, of course, without the benefit of the owners' reactions . . . . Due to the flexibility of the acquisition policy, each ownership will require individual treatment on its own merits, which can only be accomplished after a field investigation of the tract. Especially will this be true on those tracts involving mixed interests; that is, both fee and flowage easement. In the area covered in this report the topography is such, and the contours are so tight, that in most instances the blocked perimeter for the fee area also includes the flowage easement guide contour at elevation 759.0 feet."

The memorandum's real property line of 754 feet for the fee area and 759 feet for the flowage easement area included landowners' property.[2]

The Corps also drew preliminary maps showing the proposed taking area. These maps, however, mistakenly excluded the land at issue in this case. When the Corps discovered its error in 1965, it revised the maps so that they showed the property involved in the instant case to be within the taking area.

From 1959 to at least 1969 the government purchased or condemned property necessary for the reservoir. Between 1965 and 1969, the government negotiated to purchase landowners' property. The negotiations were unsuccessful: according to the government, because title to the property

---

1. Several tracts or parcels are involved in the instant case, but they are all part of the so-called "Anderson Unit," apparently originally owned by John B. Anderson, who is now deceased. Various parties have acquired interests in the Anderson Unit, and most or all of the tracts were subject to a title dispute litigated in state court. Therefore, when it seems appropriate to refer to the tracts collectively we use a singular reference to "property."

2. These figures represent the Corps' estimate of what land the government should acquire to avoid paying later for flood damage to private property. The Corps estimated that floods would inundate land up to the 754 foot level once every five years and land to the 759 foot level once every fifty years.

was being litigated in state court. The government made no attempts to negotiate after 1969 and took no further action until January 28, 1975, when it began condemnation proceedings. In 1964, more than ten years prior to the filing of the condemnation action, the Keystone Dam was closed and the lake filled to the conservation pool level of 723 feet. As a result, the value of adjacent property increased, and a major issue before the district court was whether the United States had to pay for the precondemnation enhancement resulting from the Keystone project. This issue was submitted on briefs to the district court. The court ruled that "the United States delayed too long in taking the properties which it now seeks for them to be considered within the scope of the original project," R. I, 60; therefore, landowners were entitled to the enhancement. The district court appointed three condemnation commissioners to evaluate the property. They heard testimony and recommended to the court a valuation of $37,833, which the district court approved. The government appealed on the enhancement issue, and Duffield cross-appealed on valuation.

I

In *United States v. Miller*, 317 U.S. 369, 377, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943), the Supreme Court established the test for when the government must pay enhanced value:

"The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to

gain by speculating on probable increase in value due to the Government's activities."

In *United States v. Reynolds*, 397 U.S. 14, 21, 90 S.Ct. 803, 807, 25 L.Ed.2d 12 (1970), the Court added that the test "does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the planning or original construction it became evident that land so situated would probably be needed for the public use."

■ *Miller* and *Reynolds* reflect a policy of accommodating both the government's pursuit of the general welfare through public projects and private parties' interests in the development and marketability of lands near government projects. If a landowner's property increases in value because of the government project, the government need not pay this enhanced value unless (1) the property was not within the original scope of the project; or (2) the government failed to provide the public with adequate notice of the project's scope, *see United States v. 2,353.28 Acres of Land*, 414 F.2d 965 (5th Cir. 1969); or (3) the landowner reasonably believed that subsequent government action removed the property from the project's scope, *see United States v. 320.0 Acres of Land*, 605 F.2d 762, 793 (5th Cir. 1979); *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490 (Ct.Cl. 1972); *United States v. 172.80 Acres of Land*, 350 F.2d 957, 959 (3d Cir. 1965). If the landowner can prove any of these three situations exist, upon condemnation the government must pay the enhanced value.

*Miller* and *Reynolds* recognize that the government needs some time and flexibility to plan and construct public projects. Planning the project, obtaining congressional approval and funding, acquiring the land, and actually constructing the project all take years. Often, during the various stages, the government will find it necessary to modify the project's original design. Thus, in considering whether land is within

the original scope of the project, a court must be realistic and not compel the government to follow a precise time table for acquisition or to specify exactly which lands the project will require. *See United States v. 320.0 Acres of Land*, 605 F.2d at 788 n.33. A narrow reading of *Miller's* "scope of the project" language would only encourage the government to err on the safe side by announcing a larger project than it anticipates building, which would undermine the policy favoring development of private lands adjacent to public projects. *See United States v. 62.17 Acres of Land*, 538 F.2d 670, 681 (5th Cir. 1976).

■ Courts have also imposed a heavy burden on private owners of land adjoining a project to show that the government failed to give notice or that they reasonably believed their land lay outside the scope of the project. *See, e.g., John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct.Cl. 1972); *United States v. Crance*, 341 F.2d 161 (8th Cir.), *cert. denied*, 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965). The government, for instance, need not notify individually the landowners that it intends to take their property; the public receives sufficient notice if the government specifies in its publicly disclosed plans the land that the project will require, *see United States v. 62.17 Acres of Land*, 538 F.2d at 681 n.24, or otherwise publicly indicates its plans, *Reynolds*, 397 U.S. at 21, 90 S.Ct. at 807. Consequently, if the government gave public notice of its plans, landowners must show that those plans did not include their property or that subsequent government action clearly expressed an alteration from the original plan.

In the instant case these landowners' property clearly was within the original scope of the project. The Corps of Engineers' 1959 design memorandum constituted public notice that the property was included within the taking area. The Corps' contemporaneous maps, which mistakenly did not include landowners' property within the taking area, do not prove the contrary.

First, *Reynolds* does not demand that original plans precisely specify what land the government ultimately will take; it is sufficient that during the planning or construction stages it becomes "evident that land so situated would probably be needed for the public use." *Reynolds*, 397 U.S. at 21, 90 S.Ct. at 807. In the instant case the Corps *did* specify in its design memorandum that the United States would take these landowners' property, since almost all of it was below the 759 foot elevation. The memorandum should have placed the existing and subsequent landowners on notice that the government would *probably* take their property, even though the Corps' map indicated otherwise. *See United States v. 62.17 Acres of Land*, 538 F.2d at 680–81; *cf. United States v. Crance*, 341 F.2d 161, 164 (8th Cir.), *cert. denied*, 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965) (focusing on map would give it "undue weight"); *John L. Roper Lumber Co. v. United States*, 150 F.2d 329, 332 (4th Cir. 1945) (property within original scope despite preliminary map that did not include property). Second, in its design memorandum the Corps emphasized the tentative and flexible nature of its acquisition policy. The Corps' statement that the taking line might need adjustment should suggest to the public that the Corps considered its maps to be only tentative representations of the taking area. Third, even without the design memorandum, the government's systematic acquisition of property in the Keystone area should have provided notice that the Corps would probably include the landowners' property in the project.

■ Landowners and amici curiae argue that because of the government's delay in acquiring their property, they reasonably believed the government had abandoned its plans to acquire their property. The district court agreed with them. While a clearly erroneous standard of appellate review applies, when the district court's findings, as here, are based upon briefs and documents, rather than oral evidence, the

findings do not carry as much weight. *E.g., Jennings v. General Medical Corp.*, 604 F.2d 1300, 1305–06 (10th Cir. 1979). We are equally capable of drawing conclusions from the documentary materials.

██ Having concluded the property in the instant case was within the original scope of the project, we must determine whether landowners could have reasonably believed that the government had later removed their property from the scope of the project. Length of time between commencement of a project and condemnation of property may be a factor in determining reasonableness of a landowner's belief. *United States v. 320.0 Acres of Land*, 605 F.2d at 792; *United States v. 62.17 Acres of Land*, 538 F.2d at 680–81. The government deserves no accolades for a ten-year delay between discovering its mapping error and beginning condemnation proceedings to take this property. The government held some negotiations to acquire this land until 1969 and blames its delay on state court litigation over title to the property. However, the government had the power to condemn the fee title and need not have waited for ownership to be determined. Landowners rely heavily upon their post-1965 investment in developing the property and upon language in the Annual Report of the Chief of Engineers, U. S. Army on Civil Works Activities, which commencing with the 1971 report declared, with respect to the Keystone Lake project, "Project is complete except for additional recreational facilities." But the government's inaction and the quoted statement in the Chief of Engineers' reports is all the landowners can point to in support of their position that they reasonably believed the government no longer wanted their property.

In the government's favor are the 1959 statement of original intent, the 1965 correction of the mapping error, and the negotiations for purchase that continued until 1969. Although the government should not have waited for conclusion of the title litigation, the uncertainties about who owned the property in our view weighs somewhat in favor of finding that the landowners should not have thought that the government had abandoned acquisition of this property. *Cf. United States v. 62.17 Acres of Land*, 538 F.2d at 680 (six-year delay indicates abandonment only if delay "constituted a representation to the landowner"); *United States v. 31.43 Acres of Land*, 547 F.2d 479, 481 (9th Cir. 1976) (four years "not so long as to lull property owners into a false sense of security"). Most importantly, according to the documents in the record, some of this property is below the 723 foot level, and hence has been covered with water nearly all of the time since the lake filled to the conservation pool level in 1964; obviously the government intended this property to be part of the project. Nearly all of the rest of the property is within 300 horizontal feet of the conservation pool level, which published Corps' policy says generally will be taken in fee. *See* 19 Fed.Reg. 8845 (Dec. 23, 1954). *See* Govt. Ex. 1. We think no reasonable landowner could believe the government would not condemn nearly all of this property.

On these facts we cannot say that landowners reasonably could believe the Corps had abandoned its intention to acquire their property. Neither the Corps' mapping error nor the government's delay in instituting condemnation proceedings requires the government to pay enhanced value. The district court should not have permitted evidence to be introduced of the enhancement in the property's value resulting from the project.

## II

Robert Duffield has cross-appealed, contending that the condemnation commission report grossly underestimated the value of his property and was clearly erroneous. We do not need to address Duffield's contention here. Since the district court incorrectly permitted the commissioners to hear evidence of the enhancement in the property's value resulting from the government

project, we must reject the report as a matter of law. On remand the fair market value of Duffield's property must be determined without consideration of any enhanced value due to the Keystone project.

REVERSED and REMANDED.